**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 9, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

LYNN MCDONALD-CUBA,

       Plaintiff-Counter-Defendant-
       Appellant,

v.

SANTA FE PROTECTIVE
SERVICES, INC.,

       Defendant-Counter-Claimant-
       Appellee.

No. 10-2151

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. No. 1:09-CV-00554-WJ-DJS)**

---

Submitted on the briefs:[*]

Bryan G. Davis, William G. Gilchrist, IV, Albuquerque, New Mexico, for
Plaintiff-Counter-Defendant-Appellant.

David A. Garcia, Mickey D. Barnett, Albuquerque, New Mexico, for
Defendant-Counter-Claimant-Appellee.

---

Before **O'BRIEN**, **ANDERSON**, and **TACHA**, Circuit Judges.

---

[*]    After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist the determination of
this appeal.  *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G).  The case is
therefore ordered submitted without oral argument.

**ANDERSON**, Circuit Judge.

Lynn McDonald-Cuba brought this action against her former employer, Santa Fe Protective Services, Inc. (SFPS), seeking damages for alleged violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17, and New Mexico state law. SFPS responded with counterclaims for breach of contract, intentional interference with prospective economic advantage, and breach of the duty of loyalty. SFPS later voluntarily dismissed these counterclaims. The district court then granted summary judgment in favor of SFPS on McDonald-Cuba's discrimination and retaliation claims. She appeals, we have jurisdiction, *see* 28 U.S.C. § 1291, and we affirm in part and remand in part with instructions to dismiss in part for lack of subject matter jurisdiction.

## BACKGROUND

SFPS provides security services and obtains this work through competitive bidding. It employed McDonald-Cuba from February 9, 2005 until December 7, 2007. She performed clerical and accounting work for SFPS.

McDonald-Cuba's starting salary at SFPS was $30 per hour, without benefits. By September 2005, SFPS had offered her a full-time position as a financial accounting manager, for which she was paid an annual starting salary of $58,000, plus medical benefits.

In April 2006, McDonald-Cuba married Terry Cuba, SFPS's Chief

Operating Officer. Since medical insurance was now available through her husband, she declined the medical benefits SFPS offered. She then persuaded SFPS's president to compensate her for the value it had previously been paying toward her unused medical insurance. Reflecting this agreement, SFPS gave McDonald-Cuba what amounted to a thirteen percent salary increase in 2006, which included five percent for a performance increase and another eight percent equal to SFPS's portion of her health insurance cost.

SFPS continued to provide McDonald-Cuba with favorable treatment. In December 2006, she received a $2,000 bonus. Also, at her request, SFPS permitted her to work four ten-hour days per week instead of the typical five eight-hour days. Though she was classified as a salaried manager, she was required to work only a forty-hour work week.

McDonald-Cuba nevertheless began complaining that SFPS was discriminating against her and other female supervisors. In particular, she contended that female supervisory employees at SFPS were improperly classified as "managers" rather than "directors." In February 2007, to appease her, SFPS's president Christina Maki promoted McDonald-Cuba to the position of Director of Accounting and Finance, at an annual salary of $69,789.

At the time of this promotion, five other management employees worked full time at SFPS's corporate headquarters. Three of them were classified as directors. Each of these directors were paid less than McDonald-Cuba, in some

cases substantially less.  Only Maki and Cuba were paid a higher salary than McDonald-Cuba.

Director Mark Liming, for example, SFPS's Director of Business Development, was paid $60,000 in salary and received a bonus of $3,500 in December 2006.  For this, he worked over sixty hours per week, including nights and weekends.  His job duties included hiring, disciplining, and terminating employees.  McDonald-Cuba's duties, by contrast, were largely clerical.

McDonald-Cuba alleged that in November 2007 she registered another complaint about discrimination at SFPS.  Maki had told her in March 2007 that no management employee at SFPS would receive more than a six percent salary increase that year.  But Liming and another male director did receive salary increases that exceeded six percent.  Maki explained that the reason for this was that these male directors (who made less than McDonald-Cuba) had not received salary increases in earlier years.  McDonald-Cuba told a fellow employee that she was going to write to Maki about her concerns regarding the higher salary increases for these two male directors.  Though she did not actually complain to Maki, she alleged that the fellow employee reported her intention to do so to Maki, shortly before SFPS fired McDonald-Cuba.

In the meantime, in May 2007 Terry Cuba resigned from SFPS.  In June 2007, McDonald-Cuba and Cuba formed a company called Brahma Defense Enterprises, LLC (Brahma).  McDonald-Cuba contends that Brahma did not

directly compete with SFPS. It is notable, however, that in connection with its registration on the Central Contracting Registry (CCR), a database for government contractors, Brahma identified one of its business functions using North American Industry Classification System (NAICS) code 561612, "Security Guards and Patrol Services," one of the same codes used by SFPS. Aplt. App. at 134. Also, Brahma was identified as a woman- and minority-owned business, that could compete with SFPS for contracts.

Maki learned of Brahma's current CCR registration status, and the NAICS code, in early December 2007. Prior to that time, although she knew that McDonald-Cuba and her husband had started a business, Maki testified she believed the business was only "a consulting company for unions," and did not understand that it also was registered as performing security guard services. *Id.* at 152.

Maki believed this registration represented "a huge conflict of interest." *Id.* at 151. She testified to her belief that both McDonald-Cuba and Terry Cuba "misled us to believe that they had a company doing consulting work strictly for unions, and that [Cuba] was getting out of the security field." *Id.* at 153.

Two days after her discovery of Brahma's CCR registration status, Maki terminated McDonald-Cuba's employment. In addition to her concern that McDonald-Cuba had misled her, Maki believed that "the confidential information that [McDonald-Cuba] had, she could have given to [Cuba], which he could have

-5-

given to [Brahma], and used that towards their advantage." *Id.* at 156.

After pursuing administrative remedies by filing a charge with the Equal Employment Opportunity Commission (EEOC) and receiving a right-to-sue letter from the EEOC, McDonald-Cuba brought this suit, charging that SFPS discriminated and unlawfully retaliated against her by (1) giving male employees a higher annual pay increase than the six percent she received; (2) terminating her employment; and (3) making false statements about her alleged conflict of interest and termination from employment with SFPS to third parties, including the New Mexico Department of Workforce Solutions. SFPS responded by filing an answer containing counterclaims for breach of contract, intentional interference with prospective economic advantage, and breach of the duty of loyalty. McDonald-Cuba then filed a first amended and supplemental complaint in which she alleged that SFPS had brought and pursued its counterclaim in a bad faith effort to retaliate against her for her protected activity.

## ANALYSIS

### 1. Standard of Review

"We review the grant of summary judgment de novo, applying the same standard as the district court . . . ." *Gwinn v. Awmiller*, 354 F.3d 1211, 1215 (10th Cir. 2004). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We view the record on

-6-

summary judgment "in the light most favorable to the nonmoving party." *Gwinn*, 354 F.3d at 1215.

McDonald-Cuba raises two issues on appeal. First, she contends that the district court improperly granted summary judgment on her claims premised on post-employment retaliation. Second, she argues that the district court improperly granted summary judgment on her retaliatory/discriminatory termination claim.

## 2. Post-Employment Retaliation Claims

### A. SFPS's Counterclaims

In her amended and supplemental complaint, McDonald-Cuba raised a claim that SFPS retaliated against her by filing its counterclaims in this action. She did not file a new or amended charge of discrimination with the EEOC prior to asserting this claim.

In *Martinez v. Potter*, 347 F.3d 1208, 1210-11 (10th Cir. 2003), we held that conduct occurring after the filing of an employee's Title VII complaint in federal court involving "discrete and independent [retaliatory] actions" requires the filing of a new EEOC charge. The employee in that case was fired after he filed his Title VII complaint in district court, complaining of prior acts of alleged retaliation. He attempted to add a claim for retaliation based on the firing by including it in his summary judgment brief, but he did not exhaust this new claim before the EEOC and did not move to amend his complaint to include it. We upheld the district court's grant of summary judgment, reasoning that the firing

was a "discrete and independent action[]" that should have been exhausted, even though it "occurred after the filing of the judicial complaint." *Id.* at 1211 (applying exhaustion requirement for discrete and independent retaliatory acts expounded in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 110-14 (2002)).

The question here is whether the rule in *Martinez* applies when the alleged retaliatory act occurs as part of the federal court proceedings themselves.[1] It is undeniable that a principal purpose of the exhaustion requirement is to permit the parties to resolve their dispute without resort to litigation. "[R]equiring exhaustion of administrative remedies serves to put an employer on notice of a violation *prior to the commencement of judicial proceedings*. This in turn serves to facilitate internal resolution of the issue rather than promoting *costly and time-consuming litigation*." *Martinez*, 347 F.3d at 1211 (emphasis added).

*Martinez* nevertheless applied the exhaustion requirement to alleged retaliation that occurred *after* the plaintiff had commenced judicial proceedings. *See id.* The fact that the plaintiff had already resorted to litigation did not excuse the exhaustion requirement for later, discrete acts of retaliation. The only

---

[1]    A prior unpublished decision from this circuit suggests that it should. *See McNulty v. Sandoval County*, 222 F. App'x. 770, 776 (10th Cir. 2007) (citing *Martinez*; upholding district court's refusal to grant employee leave to amend federal court complaint to assert retaliation claim based on employer's filing of counterclaim, where such amendment would have been futile because employee had not yet filed EEOC charge pertaining to counterclaim).

-8-

significant difference between *Martinez*–which we are required to follow as binding circuit precedent–and this case is that here the alleged retaliatory act involves an action taken in connection with federal proceedings themselves. McDonald-Cuba fails to supply a convincing rationale for distinguishing *Martinez* on this basis, however. We conclude that a plaintiff must exhaust administrative remedies as to discrete acts of alleged retaliation that involve the filing of a counterclaim in federal court.

McDonald-Cuba's post-termination retaliation claim based on SFPS's filing of a counterclaim, then, falls within our general rule that exhaustion of administrative remedies is a jurisdictional prerequisite to a Title VII suit. *Shikles v. Sprint/United Mgmt Co.*, 426 F.3d 1304, 1317 (10th Cir. 2005). Federal courts "lack jurisdiction to review Title VII claims that are not part of a timely-filed EEOC charge." *Annett v. Univ. of Ks.*, 371 F.3d 1233, 1238 (10th Cir. 2004). Accordingly, we remand with instructions to the district court to dismiss this claim without prejudice for failure to exhaust administrative remedies.

### B. Unemployment Proceedings Claim

We also affirm the grant of summary judgment on McDonald-Cuba's claim that "SFPS made untrue statements to third parties, including the New Mexico Department of Workforce Solutions, about Plaintiff regarding her supposed conflict of interest and termination from employment with SFPS[.]" Aplt. App. at 98, ¶ 27. In her complaint, McDonald-Cuba complained that "SFPS made

[retaliatory] statements about Plaintiff in a bad faith effort to retaliate against Plaintiff for her participation in protected activity." *See id.* ¶ 28. She failed to specifically identify the protected activity that sparked the alleged retaliation.

The district court appears to have relied on her pre-termination activities and to have concluded that they were too temporally removed from SFPS's opposition to support a retaliation claim. We need not decide whether this analysis is correct or whether summary judgment was properly granted sua sponte on this basis. On appeal McDonald-Cuba has clarified matters by abandoning reliance on her pre-termination activities. In her opening brief in this court, she specifically identifies three forms of protected activity for which SFPS allegedly retaliated by its post-employment actions: "filing a post-employment EEOC charge, seeking unemployment compensation benefits, and filing her Title VII lawsuit." Aplt. Opening Br. at 20.

Neither the filing of her EEOC charge nor her filing of this suit can serve as protected activity for purposes of her retaliation claim, however, because neither of those activities occurred *before* she filed the EEOC charge mentioned in her complaint (No. 543-2008-00260). Had SFPS retaliated for either of these actions by opposing her application for unemployment benefits, McDonald-Cuba would have been obliged to file a second EEOC charge complaining of such retaliation in order to exhaust her retaliation claim. Nothing in her complaint, the record, or her submissions to this court indicates that she did so. *See Celli v.*

-10-

*Shoell*, 40 F.3d 324, 327 (10th Cir. 1994) ("Federal courts are courts of limited jurisdiction, and the presumption is that they lack jurisdiction unless and until a plaintiff pleads sufficient facts to establish it.").

That leaves her third alleged form of protected activity: the filing of her claim for unemployment benefits. While she could potentially have exhausted a retaliation claim based on this activity as part of her EEOC charge--if both her unemployment benefits claim and SFPS's opposition took place *before* she filed the charge--this allegation fails because it presents no protected activity in opposition to discrimination. "Protected activity" consists of activity opposing or complaining about discrimination by the employer based on race, color, religion, gender, or national origin. *See* 42 U.S.C. § 2000e-2. While we have recognized that an employer's opposition to an unemployment benefits claim may represent an adverse employment action, *see Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1090-91 (10th Cir. 2007), McDonald-Cuba fails to cite any authority recognizing an application for unemployment benefits, without more, as a form of *protected activity* under Title VII.

McDonald-Cuba's retaliation claim therefore fails as a matter of law. She has identified no protected activity that could form the basis for a properly-exhausted retaliation claim.

-11-

### 3.  Termination Claim

McDonald-Cuba also asserts a claim that SFPS discriminated and retaliated against her by firing her.  We analyze this claim using the burden-shifting framework described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under the *McDonnell Douglas* approach, the plaintiff must first establish a prima facie case of discrimination or retaliation.  *Johnson v. Weld County, Colo.*, 594 F.3d 1202, 1210-11 (10th Cir. 2010).  In response, "the defendant then must articulate a legitimate, non-discriminatory [or non-retaliatory] reason for the adverse employment action."  *Id.* at 1211.  At that point, "the burden then shifts back to the plaintiff, who must prove by a preponderance of the evidence that the employer's reasons are a pretext for unlawful discrimination" or retaliation.  *Id.*

We will assume that McDonald-Cuba established her prima facie case.  In response, SFPS asserted that it fired her because "she had an undisclosed majority ownership interest in a company able to compete with SFPS."  Aplee Br. at 15. The burden then shifted back to McDonald-Cuba to show that this reason was pretextual, by presenting evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."  *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1308 (10th Cir. 2005) (quotation omitted).

-12-

## A. Maki's Prior Knowledge

McDonald-Cuba contends that SFPS's reason for firing her is unworthy of belief because "Ms. Maki already had some knowledge regarding Brahma's existence and operations prior to terminating" her employment. Aplt. Opening Br. at 30. She contends she told Maki about Brahma's security and labor relation consulting between May and December 2007 and points out that SFPS even hired Brahma to consult on bidding for a contract in the Fall of 2007, prior to her termination. Thus, Maki could not have believed Brahma was only doing consulting work for unions. None of this, however, demonstrates that Maki knew that Brahma had registered with CCR *to provide security services* (as opposed to merely consulting about security) as a minority, female-owned business until just prior to terminating McDonald-Cuba's employment. The undisputed evidence shows that Maki fired McDonald-Cuba within two days of discovering Brahma's competing CCR registration with its identical NAICS code.

In her affidavit, McDonald-Cuba asserted that notwithstanding the information on the printout, "Brahma was not [going after], and has never gone after the same contracts as SFPS" and in conclusory fashion maintained that "Brahma's selection of NAICS code 561612 on [the CCR] report did not mean that it was providing security guard and patrol services." Aplt. App. at 228. She contends that factual issues remain concerning whether Maki's belief that Brahma was a potential competitor was "reasonable." Aplt. Opening Br. at 30. But that is

-13-

not the test.  "The relevant inquiry is not whether the employer's proffered reasons were wise, fair, or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs." *Rivera v. City & County of Denver*, 365 F.3d 912, 924-25 (10th Cir. 2004) (brackets omitted).  Maki testified that when she learned of the CCR she "thought that it was a huge conflict of interest." Aplt. App. at 151.  She felt that McDonald-Cuba had "started a company that was in direct competition with me behind my back." *Id.* at 152.  McDonald-Cuba fails to show that Maki did not honestly believe these reasons or that she did not act in good faith upon her beliefs when she fired McDonald-Cuba for operating a competing business.

### B.  Liming's Conflict of Interest

McDonald-Cuba further asserts that she demonstrated pretext because similarly-situated male employees also had conflicts of interest with SFPS but were not fired for them.  Director Mark Liming, for example, held a New Mexico "resident manager" license for four other private patrol companies in 2007. McDonald-Cuba contends that these companies are SFPS's competitors and that Liming's actions therefore violated SFPS's Conflict of Interest Policy.  She argues that SFPS's justifications were pretextual because Liming was not disciplined or terminated for violating the Conflict of Interest Policy as she was.

The evidence shows that Liming was not similarly situated to McDonald-Cuba and the differential treatment he allegedly received therefore

-14-

does not demonstrate pretext. First, Liming fully disclosed his activities regarding the licenses to SFPS before he became employed at SFPS. *Id.* at 273 (Liming depo. at 147-48). Although he received $200 per month as a stipend for performing this service from three of the companies involved, neither Terry Cuba nor Maki felt his holding the licenses was a problem. *Id.* at 277. Second, Liming explained that a "resident manager" merely acts as a sort of "registered agent" for out-of-state patrol companies. This does not rise to the level of starting and owning a competing business, as Maki believed McDonald-Cuba had done.

In response, McDonald-Cuba contends that she also disclosed her activities at Brahma to SFPS and Maki had no problems with them, at least not initially. *See id.* at 228. The problem arose later, when Maki discovered the CCR printout and what it suggested about the nature and scope of McDonald-Cuba's business. McDonald-Cuba contends that a similar printout existed regarding Liming.

As noted, Liming identified himself to SFPS as a "resident manager" for four out-of-state companies. A resident manager serves only as a point of contact on behalf of an out-of-state security company that does business in New Mexico. *Id.* at 272 (Liming depo at 135). But McDonald-Cuba points to a state-generated printout identifying Liming as a Private Patrol Operations Manager, or "PPO Manager." *Id.* at 242. She asserts that under New Mexico law, a PPO Manager has much greater responsibilities than a "resident manager." A PPO manager is responsible for "operation, direction, control and management of [a] private patrol

-15-

company" in cases where the company's owner is "not licensed as a [PPO] or registered as a level three security guard." Aplt. Opening Br. at 33 (quoting N.M. Stat. Ann. § 61-27B-23(B)).

At his deposition, Liming explained that this printout was in error, and he is in fact only a resident manager, not a PPO Manager, for companies other than SFPS. Aplt. App. at 231 (Liming depo. at 134), 232-33 (Liming depo at 140-41). Even if the printout was correct, and Liming had an intention to deceive SFPS, McDonald-Cuba points us to no evidence that Maki knew that a New Mexico printout identified Liming as a PPO Manager instead of a resident manager. All Maki knew was what Liming had told her, that he was a resident manager for these companies. Both she and Cuba had already determined that this did not represent a conflict of interest sufficient to avoid hiring Liming or to require firing him.[2] Absent any evidence that Maki knew of the printout in Liming's case, and treated him differently than McDonald-Cuba, McDonald-Cuba fails to show that Liming was a similarly-situated male employee accorded differential treatment.

---

[2] McDonald-Cuba's argument that SFPS's conflict-of-interest policy does not distinguish between degrees of conflict, lacks merit. She fails to show that Maki lacked discretion in applying the policy, or was not permitted to waive its provisions under appropriate circumstances.

### C. Aduddel's Conflict of Interest

McDonald-Cuba further alleges that male employee Brett Aduddell owned a security company called Alpha Pro prior to his hiring by SFPS in 2005. She asserts that Maki approved his hiring because she believed that Alpha Pro was inactive, but that Alpha Pro was in fact in good standing with the Colorado Secretary of State during the time she was employed with SFPS. She contends that Aduddell was therefore similarly situated to her, but he was not fired.

This showing of pretext suffers from the same deficiency as that concerning Liming. McDonald-Cuba fails to demonstrate that Maki knew about Alpha Pro's status with the Colorado Secretary of State prior to the time Aduddell left SFPS in 2008. He was therefore not similarly situated to her.

McDonald-Cuba further argues that both Liming and Aduddell were given the opportunity to ameliorate any violation of the Conflict of Interest Policy when they disclosed their conflicts at the time of hiring, but she was not. This argument ignores the fact that unlike Liming and Aduddell, she did not disclose the conflict (which did not yet exist) at the time of hiring, and in fact did not ever voluntarily disclose the crucial information surrounding her conflict with SFPS. Instead, Maki discovered it through other means. Here again, McDonald-Cuba is not similarly-situated to Liming or Aduddell.

## D. Alleged Disparate Treatment

Finally, McDonald-Cuba asserts that evidence of disparate treatment of female supervisors at SFPS meets her burden of showing pretext. She complains that Liming and Aduddell received higher-than-six-percent salary increases in 2007, and were not required to undergo written performance evaluations to receive these increases. This argument ignores Maki's testimony that the increases were provided because Liming and Aduddell had not received increases in previous years and their pay was lagging. McDonald-Cuba cannot contest the fact that in 2007 she was being paid more than Liming or Aduddell. *See* Aplt. App. at 129. Once again, she fails to show that she was similarly situated to either Liming or Aduddell.

She also complains of a *favorable* action on SFPS's part: her promotion to directorship at SFPS. She contends this was offered only as a sort of "fig leaf" to hide discrimination against females at SFPS, and was only provided after she complained of discrimination because she was not a director. She objects to the fact that Maki gave her the promotion to "make her feel better" and to avoid the appearance that SFPS discriminates against women. *Id.* at 159-60.

McDonald-Cuba's argument appears to be that SFPS's actions were condescending and hence redolent of discriminatory animus because they failed to take into account her *entitlement* to the position as a director, based on merit alone. The district court characterized this argument as "absurd." *Id.* at 32. We

-18-

need not go that far. We will simply note that we fail to see how a promotion based on a complaint of discrimination, even if provided grudgingly, meets McDonald-Cuba's burden to establish that SFPS's asserted reasons for firing her were pretextual.

## CONCLUSION

We VACATE the district court's entry of judgment on McDonald-Cuba's claim concerning post-employment retaliation from SFPS's filing of a counterclaim and REMAND for its dismissal without prejudice due to lack of jurisdiction. The remainder of the district court's judgment is AFFIRMED.