Electronically Filed
Supreme Court
SCWC-12-0000741
24-FEB-2015
09:45 AM

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

CHRISTIE ADAMS, Petitioner/Plaintiff-Appellant,

vs.

CDM MEDIA USA, INC., Respondent/Defendant-Appellee.

SCWC-12-0000741

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-12-0000741; CIV. NO. 11-1-0931)

February 24, 2015

McKENNA AND POLLACK, JJ., AND CIRCUIT JUDGE ALM, IN PLACE OF
ACOBA, J., RECUSED, WITH RECKTENWALD, C.J., CONCURRING AND
DISSENTING, WITH WHOM NAKAYAMA, J., JOINS

OPINION OF THE COURT BY POLLACK, J.

## I. Background

Christie Adams (Adams) filed a complaint in the Circuit Court of the First Circuit (circuit court) alleging that she had been subjected to employment discrimination in violation of Hawai'i Revised Statutes (HRS) § 378-2. The discriminatory

act claimed by Adams was CDM Media, USA, Inc.'s (CDM) decision not to hire Adams due to her age.  CDM's motion for summary judgment was granted by the circuit court on the basis that Adams had failed to demonstrate that CDM's reasons for not hiring her were pretextual.  In a summary disposition order, the Intermediate Court of Appeals (ICA) affirmed the holding of the circuit court, and Adams sought review of the ICA judgment in this court.

For the reasons set forth below, we hold that summary judgment was improperly granted as CDM did not satisfy its burden to articulate a legitimate, nondiscriminatory reason for declining to hire Adams, and therefore pretext was not required to be considered by the circuit court.  Accordingly, we vacate the judgments of the ICA and the circuit court and remand the case to the circuit court for further proceedings.

## A.  Employment action and HCRC decision

On January 12, 2009, CDM published an online solicitation seeking applicants for its International Media Sales Executives positions.  CDM described the International Media Sales Executive position as "an inside [telephone] sales person job that . . . requires 200 to 250 cold calls a day."  The relevant portions of the advertisement stated as follows:

> We're looking for motivated, hungry people to join our ever expanding sales team in the role of advertising sales.  We offer recognized training to build upon your formal education/experience and teach you the business of

advertising and summit sales in order for you to progress and build your career quickly.

We offer great base salary, health/dental insurance and very attractive bonus scheme to ensure we have a high level of achievers applying (Realistic OTE 1st year- $70K).

The heart of CDM Media is based on a commitment to innovation, so if you are looking for a business environment that's conducive to creativity and challenge, please inquire about this unique advertising sales opportunity.

**Here are a few key benefits to working at CDM Media:**
- Competitive starting salary + aggressive commission and bonus package (Realistic first year OTE 70k)
- **First-class Sales Training Program from the best in the industry**
- Lucrative sales prizes for top-performers
- Generous paid time off programs · Comprehensive training sessions
- Health/Dental benefits
- Career development opportunities
- Referral bonuses for bringing in new sales talent
- Being a contributor to REAL growth

**Requirements**
- Sales experience preferred
- Detail-oriented and organized
- Strong communication skills
- Willingness to take on new challenges
- **MOST IMPORTANTLY**, a true determination to succeed!

(Emphasis in original). On February 11, 2009, a local newspaper posted a story stating that CDM was looking to hire "energetic and driven professionals" and was planning to put them "through an eight-week comprehensive training course." Adams saw this article and online advertisements related to the position.[1]

CDM's hiring procedure at the time was as follows:

---

[1] Adams also saw online advertisements that stated CDM was seeking "youthful" employees. Adams submitted these advertisements in response to CDM's Motion for Summary Judgment. CDM denied placing such advertisements. The circuit court found the advertisements to be inadmissible hearsay.

a.    Brandon Bera, CDM HR Director, calls all applicants to speak for a 5 minute phone screening with very basic questions regarding what interested them about CDM Media. It is then determined who will be brought in for a first round face-to-face interview.

b.    Brandon Bera, CDM HR Director, hosts the first round of interviews and reviews all candidates that came in for the interview and narrows down the list of potential candidates to meet with the CEO, Glenn Willis.  This is meant to be an interview focusing on experience, personality, characteristics, professional appearance of the candidate, and to determine if they seem like team players.  Usually, there are hundreds of applicants that are narrowed down to around 4-5 dozen that will be met in person.

c.    Those select few that stick out from the first round interview are then moved on to the second round where they will meet with CDM's CEO, Glenn Willis, and often times CDM's VP of Sales, Nick Backhouse in the same day.  This is meant to focus on more in-depth personality characteristics to and detailed questions about experience to make sure what was said in the first interview aligns to the second interview.

d.    Those that impress all parties involved in the hiring process (CDM's CEO and President Glenn Willis, HR Director Brandon Bera and sometimes Sales Vice President/Director Nick Backhouse if reassurance is needed) are then made an offer within a couple weeks of the final interview.

On February 13, 2009, Adams sent an email to CDM Human Resources Director, Brandon Bera (Bera), applying for the position.  The email included a list of awards Adams won while working for Verizon in Hawai'i, which included awards for "inside/telephone" sales and "outside" sales and at least one award exclusively for telephone sales:

**President's Award for Professional Salesmanship, Premise Sales Representative, for the Calendar Year 2000** This award is presented to the top outside sales representative (of about 23 outside sales reps) in Verizon Information Services' Honolulu Division based 80% on customer growth and 20% on customer satisfaction.

**Hall of Fame Award for the Calendar Year 2000** One of the most coveted and prestigious of all Verizon sales awards, this award is presented to outside and telephone sales

representatives who achieve a net increase of 25% for two consecutive years. . . .

**1999-2000 Silver Prize Tip** [sic] **Winner to Montreal and Quebec City, Canada** During the one-year period of the contest, winning sales representatives must achieve a minimum of 115% to sales net goal performance and a minimum of 100% to performance selling items on superpages.com, must participate in at least one Quality Improvement Team (QIT), and must have an error percentage less than 1/2 of one percent of all advertising revenue handled. Of about 23 <u>telephone</u> sales reps and 23 <u>outside</u> sales reps, I was the only sales rep in the Hawaii Division to win this prize trip, which was based upon meeting all four goals in the Hawaii marketplace.

**Top Producer, Premise Sales Reps, Kauai 2000 Telephone Directory Canvass** For 195.51% performance to goal (of about 23 <u>outside</u> sales reps).

**ZEAM Award for the Calendar Year 1999** This award is presented to sales reps who achieved or exceeded their annual sales goal with zero errors or mistakes over a one-year period of time. . . .

**Top Producer, Telephone Sales Reps, Big Island 1999 Telephone Directory Canvass** For 217% performance to goal (<u>from about 23 telephone sales reps</u>).

**Eagle Award, 1999** This award is given to sales representatives who perform at 100% or higher consistently for 26 weeks in a row.

(Underlining added). On February 18, 2009, Bera had a five-minute phone call with Adams. After the call, Adams sent Bera another email, this one including Adams' professional resume and a list of her computer, clerical, and office skills, which stated Adams had "used computers on a daily basis for the past 25 years."

The resume attached to this second email stated that Adams had "[m]ore than 20 years of full-time, hands-on experience in nearly all aspects of sales and marketing, including inside and outside sales." Adams had received a B.A.

from Stanford University and "complet[ed] additional college courses taken in Switzerland and at the University of Hawai'i at Manoa."

Adams' resume indicated that from 1984 to 1986, she was the Executive Director of The Hawai'i Society/The American Institute of Architects, where she managed the affairs of the 550-member non-profit.  From 1986 to 1998, Adams was the President of Christie Adams & Associates Marketing and Public Relations, where she worked directly with many clients, including owners of businesses, executives of nonprofits and governmental managers, to develop public relations programs and organize special events.  From September 1998 to 2003, Adams worked for Verizon selling advertising in Verizon's print and online Yellow Pages, contacting customers in person and by phone.  While working at Verizon, Adams won the sales achievement awards described in her email to Bera.

From May 2004 to September 2004, Adams was a Loan Officer with Hawaii HomeLoans where she met with prospective home loan clients "over the phone and/or in person."  Lastly, from October 1, 2004, to May 15, 2007, Adams' resume lists her as a "Caregiver for Terminally-ill parent" and, from August 2007 to August 2008, as a "Home Organizer for the Lillian B. Adams Trust."

On or about February 19, 2009, Adams was interviewed in person by Bera. On the date of the interview Adams was 59 years old. As described by Adams, "[a]t the end of the interview I asked Bera what the next step would be and he seemed hesitant to pass me along for the next interview. He said Glenn Willis would decide." Glenn Willis (Willis) was the President and Chief Executive Officer (CEO) of CDM at the time. The only notes from the interview were notations made on an attachment to Adams' first email, one of which was a box drawn around "Verizon/Yellow Pages" with the words "1/2 inside" and "1/2 outside" written beside it.[2]

Adams was not asked to return for the second interview and received no other contact from CDM until March 1, 2009. On that date, Adams received a rejection letter from CDM. On March 30, 2009, CDM hired four persons for the position sought by Adams, who ranged in age from 24 to 38. On May 15, 2009, CDM hired three more persons for the position, ranging in age from 23 to 40. By October 19, 2009, only the two youngest of the new hires were still employed by CDM.[3]

_____

[2] CDM admitted that the notes on Adams' February 13, 2009 email were "handwritten notes relating to the interview."

[3] CDM included in its Respondent's Answer to Charge of Discrimination Filed on August 27, 2009 to the HCRC a list of all employees hired around the time Adams was interviewed and a list of "current employees."

On August 27, 2009, Adams filed a Charge of Discrimination against CDM with the Hawai'i Civil Rights Commission (HCRC). In her submission to HCRC, Adams stated, "I believe that if not for my age I would have been hired for the International Media Sales Executive position." CDM filed "Respondent's Answer to Charge of Discrimination Filed on August 27, 2009" (Answer). The Answer stated, inter alia, that sales executives in the position for which Adams applied made "200 to 250 cold calls a day" and that one criteria CDM used to evaluate candidates was whether or not they had "[e]xperience in dealing with VP and C-level executives in Fortune 500 organizations." The Answer also included a list of all employees hired around the time Adams was interviewed and a list of "current employees." On February 9, 2011, the HCRC issued a Notice of Dismissal and Right to Sue Letter.

## B. Circuit Court

On May 10, 2011, Adams filed a complaint in the circuit court. The complaint alleged that CDM had violated HRS § 378-2 by discriminating against Adams due to her age. Adams alleged CDM posted advertisements seeking applicants who were "youthful" and "recent college graduates." Adams claimed she was entitled to loss of income because she was not hired as a result of discrimination and "was not able to become employed for a long period of time despite her efforts to find

employment." Adams requested an order that CDM hire her, and she also sought general damages, special damages (such as lost wages, punitive damages, and litigation costs), and attorney's fees, as well as other appropriate relief.

On June 20, 2011, CDM filed an answer to the complaint. CDM denied that Adams was qualified for the position, denied placing any ads for "youthful" people or "recent college graduates" to join its sales team, and denied that Adams was not hired because CDM "was advertising for 'youthful' applicants and 'recent college graduates.'"

On February 21, 2012, CDM filed a motion for summary judgment (MSJ). CDM claimed it was "entitled to summary judgment on [Adams'] age discrimination claim because the record lacked substantial evidence that either: (1) Adams was qualified for the sales position, or (2) CDM Media's reasons for not hiring Adams for the sales position were a pretext for age discrimination." The only relevant document attached to the MSJ is a declaration from Willis (Willis' Declaration or Declaration). In his Declaration, Willis states that it was his decision not to hire Adams in February 2009. Willis declares it was his "belief" that Adams was not qualified for the position. Willis also states that he "did not consider any criteria stated in any advertising or posting in making my decision not to hire" Adams. (Emphasis added).

The content of Willis' Declaration is as follows:

1.    I am the President and CEO of CDM Media USA, Inc.

2.    CDM Media provides business to business technology marketing services.  In particular, it provides global marketing assistance to information technology executives from Fortune 1000 companies by way of (1) web products, (2) interactive media campaigns, (3) workshops and (4) a variety of invitation-only custom technology marketing events.  All of these products are aimed at an audience of C-Level corporate executives (for example CEOs, CIOs and CFOs) with information technology responsibility for their companies.

3.    I decided not to hire Plaintiff Christie Adams in February of 2009.

4.    The inside sales person job that Ms. Adams applied for involves cold calling C-Level executives of Fortune 1,000 companies responsible for information technology, can be tedious and requires a team player.

5.    It was my belief that [Adams] was not qualified for the job because:

   a.    She had no sales experience in the prior five years;

   b.    As far as I understood, most of her recent (previous 10-15 years) sales experience was in publishing and/or selling phone book advertising which incorporated outside sales and face to face communication;

   c.    As far as I understood, she had little or no sales experience that involved selling to C-Level corporate executives of Fortune 1,000 companies; and

   d.    I was advised that she had said that she disliked tedious work.[4]

6.    The company did not hire any younger applicants with equal or lower qualifications for the position.

7.    I was not involved in creating, reviewing or approving any advertising or posting for the position for which [Adams] applied, nor was I aware of the content of such advertising or posting, and I did not consider any criteria stated in any advertising or posting in making my decision not to hire [Adams].

---

[4]    Adams disputed making such a statement.

(Emphases added).

Citing to Willis' Declaration, CDM argued the record lacked substantial evidence of Adams' qualification for the position. CDM made four arguments to establish that Adams was not qualified: (1) Adams had no sales experience in the five years prior to applying for the CDM position; (2) "very little of what Adams did more than five years before she applied for the inside sales job at CDM Media had anything to do with that job, because she spent much of her time before her more than five year hiatus as an outside sales person"; (3) Adams' "prior sales experience did not involve selling to C-level executives of Fortune 1,000 companies"; and (4) "the work at CDM Media can be tedious" and Adams had expressed a dislike of tedious work. CDM maintained that it was justified in considering recent sales experience as an important job qualification because Adams had "no relevant work experience" "that [was] sufficient ground to hold that she was not qualified for the sales position."

CDM argued further that Adams failed to establish that CDM's reasons for not hiring her were a "pretext" for discrimination. CDM contended that to establish pretext, Adams must show that CDM's explanation was "unworthy of belief," "a dishonest explanation," or "deceit used to cover one's tracks." CDM claimed that "Willis' honest belief in the reasons he had for deciding that Adams was not qualified prevents Adams from

showing pretext." CDM also claimed that "[n]o one who was hired was similarly unqualified." Even if CDM misjudged Adams' qualifications, CDM contended that it had discretion in making hiring decisions and "[i]n order to overcome this discretion, Adams would have to show that she was 'clearly superior' or 'significantly' or 'markedly' better than chosen candidates." CDM argued that Adams made no such claims.

On June 27, 2012, Adams filed a memorandum in opposition to the MSJ. Adams attached a declaration to her submission, stating "I had provided Bera with sufficient information of my qualifications before and during the phone interview to set up an in-person interview, and at the in-person interview." Adams noted, "CDM did not state that job applicants needed to be currently employed in sales." Adams represented that none of the "online classified ads placed by Defendant for employees that I saw" mentioned that the position required sales experience selling to C-Level corporate executives of Fortune 1,000 companies. Likewise, Adams declared this "area of expertise" was not "mentioned to me during my telephone interview by Bera, nor during my in-person interview with Bera."

Adams also declared that, contrary to Willis' statement, her sales experience in the ten to fifteen years prior to the interview was not limited to outside, face-to-face sales of printed phone book advertising, but also included

"online, selling websites and links for customers," as well as "print and online advertising full-time in an inside sales position over the phone from September of 1998 to about May of 2000, when our management promoted me into outside sales." Adams stated that she possessed twenty-five years of "computer experience" at the time of the interview.

Adams additionally set forth in her declaration that she "previously had dealt with many high-level executives dating back to my first full-time job in 1974." Adams stated, "[e]ven though I was well qualified for the position, was a top sales associate when employed by the yellow pages, had won numerous sales awards there, and had traveled all over the world, I feel that CDM did not hire me because I was not 'young' enough for CDM Media."

In Adams' memorandum in opposition, she argued first that it was "obviously not true" that she was unqualified for the job as she "was highly qualified for the job due to her experience in sales." Adams maintained that "the job did not require sales experience," and thus the argument that Adams did not have the required sales experience is "pure pretext to cover age discrimination." Adams also denied stating that she did not like tedious work.

On June 29, 2012, CDM filed a reply. CDM contended that Willis' Declaration supported the fact that CDM had

"presented evidence that it did not hire younger applicants than Adams who had qualifications equal to or lower than hers." CDM maintained that Adams presented no admissible evidence "that any person CDM Media hired is younger and/or equally or less qualified than Adams."

On July 5, 2012, a hearing was held on the MSJ. The court explained that "the question in the Court's mind boiled down to the third prong of the McDonnell Douglas test." The court's view was that Adams had not raised a genuine issue of material fact with regard to pretext.

Adams responded that she did not need to prove pretext because CDM had not satisfied its burden of showing that it had legitimate nondiscriminatory reasons not to hire Adams. CDM replied that the five-year gap in Adams' work experience was a sufficient nondiscriminatory reason not to hire Adams. Adams' counsel countered that the five-year gap was irrelevant because Adams "was a good, an excellent, a terrific, a fantastic salesperson. . . ." Counsel noted, "[y]ou know, this is not rocket science. You get on the phone. You have a very good personality. You know what the script is to talk to people about, which is provided by the company. So how does that have any relationship to a decision not to hire her?"

Adams maintained that CDM's contention that she said she did not like "tedious" work was not only false but was also

"created to substantiate their pretext for not hiring her." Adams argued that although Willis stated the job required a "team player," "he didn't say anything about why [Adams was] not a team player."

In response to the court's specific inquiry into what Adams' arguments were concerning pretext, Adams argued the following: (1) the contentions that she did not have sales experience for five years or experience calling C-level executives were both pretext for discrimination because the posted job advertisements did not state that sales experience or experience in calling executives was required; (2) the "tedious work" comment was clearly a material issue of fact as anyone who heard such a comment would not hire a person for the job, and Willis based his decision on that comment; and (3) no evidence was presented that Adams was not a team player. Adams concluded that material issues of fact existed and that summary judgment was inappropriate.

The circuit court orally ruled that, under McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), Adams had made a prima facie case of discrimination: "This Court, under the pertinent McDonnell Douglas test . . . concludes that the plaintiff did meet their initial burden of establishing the prima facie showing." Thus, the burden shifted to the employer, and "[t]he employer, based on the paper submitted to the Court,

did establish legitimate nondiscriminatory reason [sic] for not hiring the plaintiff."  The circuit court concluded that Adams "did not raise triable issues of material fact as to the employer's reason that the non-hiring was pretextual."

Concerning the "tedious work" comment, the circuit court ruled "there may be a material – there may be a disputed fact there.  But in this Court['s] view, that alone is not enough to meet plaintiff's burden, once we hit the third prong of the McDonnell Douglas test."

Concerning Adams' argument that the persons hired instead of Adams "had no sales experience, or sales experience that was less than that of the plaintiff," the circuit court ruled "all that's submitted in support of that assertion is her own declaration."  The circuit court viewed that evidence as "not admissible."  Accordingly, the circuit court granted summary judgment in favor of CDM.

The circuit court did not make separate findings of fact and conclusions of law.  The July 24, 2012 Order Granting Defendant's Motion for Summary Judgment Filed February 21, 2012, affirmed the circuit court's oral ruling.

> [T]he [circuit court] finds and orders as follows:
>
> That [Adams] has met her burden of showing a prima facie case of age discrimination.  That [CDM] has met its burden to articulate a legitimate nondiscriminatory reason for not hiring [Adams].  That the burden therefore shifted to [Adams] to demonstrate [CDM's] reasons were perpetual. That [Adams] failed to raise a genuine issue of material fact as to whether [CDM's] reasons were pretextual.  That

> [CDM's MSJ] should therefore be granted and [Adams']
> Complaint dismissed.

Also on July 24, 2012, the circuit court entered its final judgment in favor of CDM. On August 23, 2012, Adams filed a timely notice of appeal to the ICA.

### C. Appeal to the ICA

On December 26, 2012, Adams filed her Opening Brief with the ICA contending that the trial court erred in granting summary judgment in favor of CDM. Adams requested the ICA reverse the circuit court's decision and remand for trial.

Adams first argued that "CDM did not meet its initial burden of establishing a legitimate, nondiscriminatory justification for not hiring [Adams]." Adams contended that Willis' statements concerning CDM not hiring any younger, equally or less qualified individuals than Adams, and "Adams did not have enough sales experience for the job," "are conclusory statements not supported by evidence." Adams maintained that she had no "duty to rebut these statements until the statements themselves had been properly supported by evidence." Adams also maintained that "Willis' conclusory statements that Adams didn't measure up should have been supported by the resumes of the individuals who were hired."

On April 15, 2013, CDM filed its Answering Brief. CDM reasserted its contention that Adams was not qualified for the position. CDM argued that Adams "[i]n particular, [] failed to

- 17 -

establish the second element for a prima facie case, i.e., that she was qualified for the position for which she applied." CDM maintained that it had articulated a legitimate, nondiscriminatory reason for not hiring Adams. Relying on Willis' Declaration, CDM maintained the legitimate reason was that:

> Willis decided that [Adams] was not qualified for the job because [Adams] had no sales experience in the prior five years. Willis understood that [Adams'] recent sales experience (the previous 10-15 years) was in publishing and selling phone book advertising which involved outside sales and face to face communication. Willis understood [Adams] had little or no sales experience that involved selling to C-level executives of Fortune 1,000 companies. Willis was advised that [Adams] said that she disliked tedious work.

Furthermore, CDM argued it "was entitled to use subjective hiring criteria." CDM maintained that "contrary to [Adams'] contentions, CDM does not have the burden of proving that the persons it hired were more qualified than [Adams]." CDM argued that it could "appropriately consider factors not listed in the advertisement" in making hiring decisions.

### D. ICA decision

On October 18, 2013, the ICA issued its Summary Disposition Order (SDO). The ICA held that CDM stated a legitimate nondiscriminatory reason for not hiring Adams, pursuant to McDonnell Douglas. The ICA found that "Adams did not produce persuasive, admissible evidence that CDM's reasons were pretextual and thus failed to satisfy her burden under McDonnell Douglas." Thus, the ICA affirmed the circuit court's

- 18 -

rulings.  Aside from the introductory paragraphs, the ICA's decision was as follows:

> Adams was 59 years old when CDM declined her application to a sales position in their Honolulu office.  CDM stated that its decision was based on Adams' lack of recent and relevant work experience in inside sales to high level corporate executives in Fortune 1,000 companies.  By articulating this "legitimate, nondiscriminatory reason" for refusing to hire Adams, CDM satisfied its burden under the pertinent McDonnell Douglas test for age discrimination.  Shoppe v. Gucci Am., Inc., 94 Hawai'i 368, 378, 14 P.3d 1049, 1059 (2000) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)); (holding modified by Hazen Paper Co. v. Biggins, 507 U.S. 604 (1993)); and (holding modified by Wilmot v. Forest City Auto Parts, 2000 WL 804616 (Ohio Ct. App. Jun. 22, 2000)).  Adams did not produce persuasive, admissible evidence that CDM's reasons were "pretext" and thus failed to satisfy her burden under McDonnell Douglas.  Shoppe, 90 Hawai'i at 378-79, 14 P.3d at 1059-60.  Accordingly, the circuit court concluded that Adams "did not raise triable issues of material fact as to [CDM's reasons for not hiring her]" and granted summary judgment for CDM.
>
> Therefore,
>
> IT IS HEREBY ORDERED that the July 24, 2012 Final Judgment granting the July 24, 2012 "Order Granting Defendant's Motion For Summary Judgment Filed February 21, 2012" is affirmed.

Adams v. CDM Media USA, Inc., No. CAAP-12-0000741, 2013 WL 5707278 (App. Oct. 18, 2013) (SDO).  The ICA issued its final judgment on November 21, 2013.

### E.  Application for Writ of Certiorari

On December 23, 2013, Adams filed her Application for Writ of Certiorari (Application).[5]  Adams presented two questions for decision:

---

[5]     CDM did not file a response to the Application.

> A. Whether the [ICA] committed a grave error of law or fact in affirming the Circuit Court grant of summary judgment?
>
> B. Whether the decision of the [ICA] contains inconsistencies with those of this court of a magnitude dictating the need for further appeal?

Adams maintains, inter alia, that "CDM failed to meet its initial burden of establishing a legitimate nondiscriminatory justification for not hiring Adams." Adams contends that the evidence, viewed in the light most favorable to her, "leads to the conclusion that Willis did not even make the decision not to hire Adams." Adams argues that "it was actually Bera who decided not to hire Adams as it would have been impossible for Willis to hire Adams without having interviewed her."[6] Adams requests that this court review the ICA's affirmation of the circuit court's decision.

## II. Standard of Review

"We review a circuit court's award of summary judgment de novo under the same standard applied by the circuit court." Shoppe v. Gucci Am., Inc., 94 Hawai'i 368, 376, 14 P.3d 1049, 1057 (2000) (alteration omitted) (quoting Amfac, Inc. v. Waikiki

---

[6] Adams argues further that, under a "cat's paw theory," even if Willis was the ultimate decision-maker and held no discriminatory animus toward Adams, she could still prove discrimination by CDM if the ultimate adverse employment action was influenced or motivated in some way by the bias of an employee, such as Bera, who contributed to the decision. Adams argues that "to establish a legitimate nondiscriminatory reason for rejecting Adams' application, CDM was required to submit a declaration by Bera explaining why he did not forward Adams['] application on to Willis for further review." Thus, Adams concludes this failure to establish a lack of discriminatory animus on the part of Bera was sufficient reason to deny summary judgment in favor of CDM.

Beachcomber Inv. Co., 74 Haw. 85, 104, 839 P.2d 10, 22 (1992)). "[S]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Id. "A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." Id. "[T]he evidence must be viewed in the light most favorable to the non-moving party." Id.

### III. Discussion

#### A. HRS Chapter 378 and the Shoppe-McDonnell test

HRS § 378-2(1)(A) (1999) states, "It shall be an unlawful discriminatory practice: [] Because of . . . age . . . [f]or any employer to refuse to hire . . . any individual."[7]

In enacting Revised Laws of Hawai'i (RLH) § 90A-1 (1963), the precursor to HRS § 378-2, HRS Tables of Disposition,

---

[7]    HRS § 378-2(1)(A) (1999) states in full:

It shall be an unlawful discriminatory practice:

(1) Because of race, sex, sexual orientation, age, religion, color, ancestry, disability, marital status, or arrest and court record:

(A) For any employer to refuse to hire or employ or to bar or discharge from employment, or otherwise to discriminate against any individual in compensation or in the terms, conditions, or privileges of employment . . . .

at 8 (1968), the legislature stated that the purpose of the bill was

> to protect and safeguard the right and opportunity of all persons to seek, obtain, and hold employment or membership in a labor organization without discrimination or abridgement on account of race, sex, age, religion, color or ancestry.  It is not the intent of this bill to tell an employer whom to hire, but to declare it to be unlawful for an employer to refuse to employ, or to discharge from employment, any individual because of race, sex, age, religion, color or ancestry, nor is it the intent of this bill to interfere with management or an employer's prerogative to select the best qualified person for any given position in accordance with established occupational qualifications that are applied equally to all persons.

S. Stand. Comm. Rep. No. 573, in 1963 Senate Journal, at 866 (emphases added) (hereinafter 1963 Senate Journal); see 1963 Haw. Sess. Laws Act 180, § 1 at 223.  The purpose of the bill is to "afford[s] all persons equal opportunities in employment . . . , with the qualifications of the applicants being the sole test in selecting employees."  1963 Senate Journal at 866.

HRS Chapter 378 endorses an employer's authority to decline to hire employees based on legitimate job qualifications.  That chapter does not "[p]rohibit an employer . . . from refusing to hire . . . any individual for reasons relating to the ability of the individual to perform the work in question."  HRS § 378-3(3) (Supp. 1999) (emphasis added). Therefore, when hiring employees, an employer may consider any reason related to the ability of an individual to perform the work in question, but the employer is not permitted, subject to

exceptions not relevant to this case,[8] from considering age, as well as the other categories set forth in HRS § 378-2(1).

A plaintiff can prove age discrimination "by adducing circumstantial evidence of discrimination."[9]  Shoppe, 94 Hawai'i at 378, 14 P.3d at 1059.  When analyzing a claim of age discrimination relying on circumstantial evidence, this court has set forth a three-step analysis, modifying the test adopted in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Shoppe, 94 Hawai'i at 378-79, 14 P.3d at 1059-60.  "First, the plaintiff must establish a prima facie case of discrimination by demonstrating, by a preponderance of the evidence, the following four elements: (1) that plaintiff is a member of a protected class; (2) that plaintiff is qualified for the position for which plaintiff has applied . . . ; (3) that plaintiff has

---

[8]     HRS § 378-3 provides, inter alia, that, the provisions of Part 1 of HRS Chapter 378 will not: repeal any law, prevent employers from establishing "bona fide occupational qualifications," affect the operation of retirement plans, prohibit religious organizations from preferring individuals of the same religion, conflict with security regulations of the United States or the State, require unreasonable structural changes or expensive equipment alterations to accommodate a person with a disability, prohibit schools from considering criminal convictions, prohibit financial institutions from considering any criminal offense involving dishonesty or a breach of trust, preclude any employee from bringing a civil action for sexual harassment or sexual assault, or require an employer to accommodate the needs of a nondisabled person associated with a person with a disability. See HRS § 378-3.

[9]     "Because an employer who discriminates is unlikely to leave a smoking gun attesting to a discriminatory intent . . . a victim of discrimination is seldom able to prove his claim by direct evidence, and is usually constrained to rely on circumstantial evidence."  McMillan v. Examination Mgmt. Servs., Inc., No. 94 CIV. 2229 LAP, 1996 WL 551725 (S.D.N.Y. Sept. 27, 1996) (internal quotation marks omitted).

suffered some adverse employment action . . . ; and (4) that the position still exists."[10] Id. at 378, 14 P.3d at 1059.

In the second step, "[o]nce the plaintiff establishes a prima facie case of discrimination, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action." Id. "The employer's explanation must be in the form of admissible evidence and must clearly set forth reasons that, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the challenged employment action." Id. "Although the burden of production is shifted to the employer, the ultimate burden of persuading the trier of fact that the employer intentionally discriminated against the plaintiff remains at all times with the plaintiff." Id. at 378-79, 14 P.3d at 1059-60 (alteration omitted) (internal quotation marks omitted) (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)).

In the third step, "if the employer rebuts the prima facie case, the burden reverts to the plaintiff to demonstrate

---

[10]     The fourth element of the McDonnell Douglas prima facie analysis requires proof "that, after [the complainant's] rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973) (emphasis added). Shoppe does not require the claimant to provide proof of the qualifications of the applicants that the employer continued to seek for the position. Shoppe, 94 Hawai'i at 378, 14 P.3d at 1059.

that the defendant's proffered reasons were 'pretextual.'"  Id.
at 379, 14 P.3d at 1060.  A plaintiff may establish pretext by
"persuading the court that a discriminatory reason more likely
motivated the employer or . . . by showing that the employer's
proffered explanation is unworthy of credence."  Id.

### B.  Prima facie case

In the present case, Adams clearly established a prima
facie case of discrimination and therefore satisfied the first
step of the Shoppe-McDonnell standard.

At the hearing on the motion for summary judgment, the
circuit court made a specific finding that Adams established a
prima facie case, thus expressly determining that Adams was
qualified for the position.  "This Court . . . concludes that
the plaintiff did meet their [sic] initial burden of
establishing the prima facie showing."  The court reiterated
this finding in the written order granting the MSJ: "the
[circuit court] finds and orders as follows: That [Adams] has
met her burden of showing a prima facie case of age
discrimination."

The record amply demonstrates that Adams clearly
satisfied all four elements of the first prong of the Shoppe-
McDonnell test.  In its Answering Brief to the ICA, CDM argued
that Adams "[i]n particular, [] failed to establish the second
element for a prima facie case, i.e., that she was qualified for

the position for which she applied."  CDM did not contest the first, third, and fourth requirements of Adams' prima facie case.

In any event, establishment of the first, third, and fourth elements are beyond dispute.  First, Adams was fifty-nine years old at the time when she applied with CDM, so she is part of a protected class.[11]  As to the third element, Adams suffered an adverse employment action when CDM decided not to hire her.  In regard to the fourth element, the position continued to exist after she received a rejection letter on March 1, 2009, because later that year CDM hired seven persons as International Media Sales Executives.

As to the second element, it is also clear that Adams was qualified.  CDM argued to the ICA that Adams was not qualified for the position because she did not have recent or relevant sales experience.  However, the phone sales position did not require sales experience.

---

[11]    The bill enacting RLH § 90A-1 originally included a specific prohibition on discrimination in hiring of persons between the ages 40-65, which was later deleted.  H. Stand Comm. Rep. Nos. 31 & 80, in 1963 House Journal, at 591 & 607; S. Stand. Comm. Rep. Nos. 399 & 810, in 1963 Senate Journal, at 810 & 867.  The Senate explained, "The deletion of reference to ages 40 to 65 is not to be construed . . . as an avoidance [of] the problems of our older workers, but rather as an attempt to make discrimination on the basis of age more inclusive by removing specific limitations."  1963 Senate Journal at 867.  While HRS § 378-2(1) does not specify specific age limitations, Adams' inclusion as a protected person was not challenged in this case.

First, the advertisement CDM posted for the job stated that sales experience was "preferred," but not required.  If sales experience was a "preference" and not a minimum qualification, then Adams could have had no sales experience and she still would have been qualified for the job.

Second, the hiring solicitation posted by CDM promised extensive training.  "We offer recognized training to build upon your formal education/experience and teach you the business of advertising and summit sales in order for you to progress and build your career quickly."  "Here are a few key benefits of working at CDM Media: . . . First-class Sales Training Program from the best in the industry."  Similarly, newspaper articles regarding CDM's solicitation indicated "[a]ll sales hires will go through an eight-week comprehensive training course."  The offer of extensive training underscores the fact that no sales experience was required.

Moreover, Adams had extensive sales experience.  Adams owned and operated her own marketing company for twelve years, during which time she "[w]orked directly with owners of businesses, executives of nonprofits and governmental managers."  Subsequently, Adams worked for five years with Verizon.  During that time, Adams worked in both "inside" and "outside" sales.  Viewed in the light most favorable to Adams, this fact was specifically recognized by CDM when one of its agents made the

hand-written notes "1/2 inside" and "1/2 outside" on Adams' first email besides the boxed-in words "Verizon/The Yellow Pages." While employed as a sales person at Verizon, Adams won at least one award specifically for her inside/telephone sales work. In addition, Adams won six other awards, all for outperforming her peers and maintaining consistently positive sales results. Adams denied stating that she disliked tedious work, and thus this evidence is not weighed against Adams on summary judgment. Because sales experience was merely "preferred" and Adams had extensive sales experience, Adams was qualified for the position and clearly satisfied the second element of the prima facie test.

Therefore, because the circuit court made an express determination that Adams established a prima facie case, and the evidence in the record, viewed in the light most favorable to Adams, demonstrates that she met the four elements of the Shoppe-McDonnell prima facie test, Adams established a prima facie case of age discrimination.

### C. Legitimate, nondiscriminatory reason

Once Adams established a prima facie case of age discrimination, a burden of production shifted to CDM to "articulate a legitimate, nondiscriminatory reason" for not hiring Adams. Shoppe, 94 Hawai'i at 378, 14 P.3d at 1059.

In this case, Willis articulated four reasons in paragraph 5 of the Declaration for not hiring Adams:

> 5.     It was my belief that the Plaintiff was not qualified for the job because:
>   a.   She had no sales experience in the prior five years;
>   b.   As far as I understood, most of her recent (previous 10-15 years) sales experience was in publishing and/or selling phone book advertising which incorporated outside sales and face to face communication;
>   c.   As far as I understood, she had little or no sales experience that involved selling to C-Level corporate executives of Fortune 1,000 companies; and
>   d.   I was advised that she had said that she disliked tedious work.

Accordingly, we consider whether Willis' Declaration articulates a legitimate, nondiscriminatory reason for the adverse employment action.

## 1.    Defining "legitimate" in the context of HRS Chapter 378

"Legitimate" is defined as "lawful," or "genuine." Black's Law Dictionary 984 (9th ed. 2009). "[A] 'legitimate' reason must be one that is justifiable in view of the purposes of the [statute]." Hill v. Mississippi State Emp't Serv., 918 F.2d 1233, 1243-44 (5th Cir. 1990) (Rubin, J., dissenting).

In applying the second step of the analysis, "[t]he employer's explanation must be in the form of admissible evidence and must clearly set forth reasons that, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the challenged employment action." Shoppe, 94 Hawai'i at 378, 14 P.3d at 1059. However,

if the employer's articulated reason is not legitimate (or is discriminatory) or if the articulated reason is not in the form of admissible evidence, then the burden of production has not been met.[12]

### a. Legislative intent of HRS § 378-2

Legislative history is a valuable indicator of the purpose of a statute. "This court's primary duty in interpreting and applying statutes is to ascertain and give effect to the legislature's intention to the fullest degree." Nat'l Union Fire Ins. Co. v. Ferreira, 71 Haw. 341, 345, 790 P.2d 910, 913 (1990); HRS § 1-15(2) (2009) ("The reason and spirit of the law, and the cause which induced the legislature to enact it, may be considered to discover its true meaning."). In interpreting statutes, "this court 'must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.'" Schmidt v. HSC, Inc., 131 Hawai'i 497, 508, 319 P.3d 416, 426 (2014) (emphasis added) (quoting Blaisdell v. Dep't of Pub. Safety, 113 Hawai'i 315, 318, 151 P.3d 796, 799 (2007)).

The purpose of HRS Chapter 378 is to ensure that hiring criteria are "in accordance with established occupational

---

[12]     See HRE Rule 301(3); (defining the "burden of producing evidence" as the obligation of a party to introduce evidence of the existence or nonexistence of a relevant fact sufficient to avoid an adverse peremptory finding on that fact"); see also HRE Rule 303(b).

qualifications that are applied equally to all persons."  1963

Senate Journal at 866.  When the law was initially enacted as

Act 180, section (1)(a) of the law read as follows:

> (1) It shall be unlawful employment practice or unlawful discrimination:
>
> > (a) For an employer to refuse to hire or employ or to bar or discharge from employment, any individual because of his race, sex, age, religion, color or ancestry, <u>provided that an employer may refuse to hire an individual for good cause relating to the ability of the individual to perform the work in question</u> . . . .

<u>See</u> 1963 Haw. Sess. Laws Act 180, § 1 at 223, codified at RLH

§ 90A-1, recodified to HRS §§ 378-2 and 378-3 (emphasis added).[13]

Thus, as enacted, the law explicitly linked the authority to

refuse to hire or discharge to "good cause relating to the

ability of the individual to perform the work in question."  As

explained by the Senate committee report, specifically referring

to section (1)(a) of Act 180, the policy supported by the law

was to "afford all persons equal opportunities in employment

. . . with the qualifications of the applicants <u>being the sole</u>

<u>test</u> in selecting employees."  1963 Senate Journal at 866

(emphasis added).[14]

---

[13]     The minority asserts that "the 1963 version [of the statute] was unclear."  Minority at 25.  However, the minority declines to demonstrate the alleged lack of clarity.

[14]     In full, the passage provides as follows:

This bill does not give minority group members any special privileges in obtaining employment but afford [sic] all persons equal opportunities in employment regardless of race, sex, age, religion, color or ancestry with the

(continued. . .)

> Section 1(a) of the bill provides in part that an employer may refuse to hire an individual for <u>good cause relating to the ability of the person to perform the work in question</u>[].  An employer may refuse to hire an individual for justifiable and reasonable cause.  In this connection, the employer may, depending on the job, consider the training, experience, intelligence, personality and appearance of the applicant where <u>any or all of these factors are applied equally to all applicants</u> and are determinative in the selection of the best qualified.[15]

<u>Id.</u> at 867 (emphases added) (internal quotation marks omitted).  Chapter 378 therefore does not prohibit an employer from refusing to hire an individual for reasons that are applied equally to all applicants and are "<u>relat[ed] to the ability of the individual to perform the work in question</u>."  HRS § 378-3(3) (emphasis added).  Thus, a "legitimate, nondiscriminatory reason" not to hire a person, in view of the purposes and statutory provisions of HRS Chapter 378, must be a reason related to the "ability of the individual to perform the work in question."

### b.  Subsequent recodification did not alter the intent of the legislature

RLH § 90A-1 was recodified to HRS Chapter 378 in 1981 and reorganized with the addition of protections for women and government workers.  1981 Haw. Sess. Laws Act 94, §§ 1-3 at 184-

---

(. . .continued)
qualifications of the applicants being the sole test in selecting employees.

1963 Senate Journal at 866.

[15]     Appearance cannot include color or racial characteristics.  1963 Senate Journal at 867.

89.   Reformation or reenactment of a statute does not alter the purpose or intent of a law unless that is the express intent of the legislature.  Muniz v. Hoffman, 422 U.S. 454, 470 (1975) ("It will not be inferred that the legislature, in revising and consolidating the laws, intended to change their policy, unless such an intention be clearly expressed." (emphasis added)).

> If a revised statute is ambiguous or susceptible of two constructions, reference may be made to the prior statute for the purpose of ascertaining intent.  But mere differences in words or arrangement should not generate an inference of legislative intent to change the former rule.  A revision will not be construed as altering a particular statute absent a clear, unmistakable legislative intent.

Le Mars Mut. Ins. Co. of Iowa v. Bonnecroy, 304 N.W.2d 422, 424 (Iowa 1981) (emphasis added) (citations omitted); see also Pye v. State, 919 A.2d 632, 637 (Md. 2007) ("[A] change in a statute as part of a general re-codification will ordinarily not be deemed to modify the law unless the change is such that the intention of the Legislature to modify the law is unmistakable.").

As stated by the legislature, the purpose of the 1981 revisions was to "extend coverage of Part I (Discriminatory Practices) of the Employment Practices Act, Chapter 378, Hawaii Revised Statutes, to Employees of the State and county governments to help ensure that women are provided equal treatment in employment when disabled because of pregnancy-related conditions, and to clarify policies and procedures in the area of enforcement with respect to unlawful or

discriminatory employment practices." H. Stand. Comm. Rep. No. 549, in 1981 House Journal, at 1166 (emphases added). Thus, the express intent of the 1981 legislature was to expand the safeguards offered by the employment discrimination provision of HRS Chapter 378. In contrast, the legislative history does not reveal any intention to alter the fundamental purposes of the employment discrimination law or to reduce its protections. Therefore, the 1963 legislative history continues to provide a significant and reliable averment that the purpose of HRS § 378-2 is to "afford all persons equal opportunities in employment . . . with the qualifications of the applicants being the sole test in selecting employees." 1963 Senate Journal at 866; see Muniz, 422 U.S. at 470.

As recodified, HRS § 378-3(3) preserves the intent of the legislature. In the 1981 revision, the legislature shifted language "provid[ing] that an employer may refuse to hire an individual for good cause relating to the ability of the individual to perform the work in question," 1963 Haw. Sess. Laws Act 180, § 1 at 223, to "Nothing in this part shall be deemed to . . . [p]rohibit . . . an employer . . . from refusing to hire . . . any individual for reasons relating to the ability of the individual to perform the work in question." HRS § 378-3. Thus, following the recodification, the substance of the statute is identical: in 1963 the language provided an exception

to the prohibition against discriminatory hiring or discharging practices and the language continues to do so in the 1981 revision, underscoring the fact that the legislature has provided no indication that the purpose of the statute has been altered.

Nonetheless, the minority maintains that the purpose and intent of HRS § 378-2 was transformed based on the 1981 recodification.  Minority at 24-25.  However, the minority does not provide any legislative history to support its contention that the 1981 revision was intended to alter the purpose of HRS Chapter 378.  See Minority at 22-26.  Thus, the interpretation of the minority must be rejected as the legislature did not express any intent to change the policy of the statute.  Muniz, 422 U.S. at 470; Le Mars Mut. Ins. Co., 304 N.W.2d at 424 ("A revision will not be construed as altering a particular statute absent a clear, unmistakable legislative intent.").[16]

---

[16]    Although the minority contends the 1963 legislative history is irrelevant, minority at 26-27 n.6, it nevertheless also disputes the interpretation of certain passages from the 1963 Senate Journal.  Id.  The minority argues that statements from the journal "that reference the qualifications of the applicant," "when viewed in context, [] appear to be general statements of support for equal opportunity, and not directives to employers to base their hiring decisions solely on an applicant's qualifications."  Minority at 26 n.6.  Respectfully, the legislature's statement that "This bill . . . afford[s] all persons equal opportunities in employment . . . with the qualifications of the applicants being the sole test in selecting employees," 1963 Senate Journal at 866 (emphasis added), is much more than a "general statement of support," especially when viewed in conjunction with the specific statutory language adopted by the  legislature in RLH § 90A-1.  1963 Haw. Sess. Laws Act 180, § 1 at 223, recodified at HRS §§ 378-2 and 378-3.

The minority alternatively argues, "Even if the Majority is correct that the purpose of the current statute remains the same as the 1963 version, our plain reading interpretation of the current statute is consistent with that legislative purpose when viewed in light of the whole legislative history."  Minority at 26 (emphasis added).  The minority's argument does not provide the context by which to understand its reference to the "light of the whole legislative history" or provide legislative history that contradicts the 1963 legislature's intent as described above.  Thus, if the purpose of the current statute "remains the same as the 1963 version," then the minority's "plain reading interpretation" of the current statute is pointedly inconsistent with the "whole legislative history."

Finally, the minority contends that when the 1963 legislature made the statement that the qualifications of the applicants shall be the sole test in selecting employees,[17] "the legislature was addressing concerns that the statute might create special preferences (such as hiring quotas) for minorities."  Minority at 26 n.6.  The minority does not present any authority in support of a legislative concern regarding "special preferences."  Surely, the right of individuals

---

[17]     See supra note 14 for the full text of the "sole test" statement.

protected under HRS § 378-2 to expect that their ability to perform the work in question will be the "sole test" in an employment decision, subject to the exceptions of HRS § 378-3, which is not a "special preference" but rather the embodiment of the protection that HRS Chapter 378 guarantees.

### c. Principles of statutory construction reinforce the legislature's intent

When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language of the statute itself. Kauai Springs, Inc. v. Planning Comm'n of Cnty. of Kauai, 133 Hawai'i 141, 163, 324 P.3d 951, 973 (2014). We must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose. Id. Additionally, "Laws in pari materia, or upon the same subject matter, shall be construed with reference to each other." HRS § 1-16. Further, when construing a statute, courts are "bound to give effect to all parts of a statute, and no clause, sentence, or word shall be construed as superfluous, void, or insignificant if a construction can be legitimately found which will give force to and preserve all words of the statute." Fagaragan v. State, 132 Hawai'i 224, 241, 320 P.3d 889, 906 (2014) (citation and alteration omitted).

HRS §§ 378-2 and 378-3 both concern lawful employment practices.  Thus, in order to give effect to HRS § 378-2, the prohibitions of that section must be read together with HRS § 378-3.  See HRS § 1-16.  In HRS § 378-3, the legislature has provided a list of eleven specific exceptions to the employment discrimination prohibition of HRS § 378-2.  For instance, as stated, the legislature permits an adverse employment decision when the reason for that decision is related to the person's ability to perform the work in question.  HRS § 378-3(3).  Other exceptions, inter alia, allow religious organizations to give employment preference to individuals of the same religion, HRS § 378-3(5), and exempt employers from having to make "unreasonable" structural changes or "expensive" equipment alterations to accommodate a person with a disability.[18]  HRS § 378-3(7).

Statutory lists may be interpreted under the principle of expressio unius est exclusio alterius; i.e., the express inclusion of certain items in a statutory list implies the exclusion of others and of alternatives.  Fagaragan, 132 Hawai'i at 242, 320 P.3d at 907.  This principle applies equally to a statutory list of exceptions; when the legislature has created certain exceptions, "it does not follow that courts have

_____

[18]     For a summary of all the exceptions, see supra note 8.

authority to create others."  United States v. Johnson, 529 U.S. 53, 58 (2000).  The "proper inference" from a list of exceptions to a statute is that the legislature "considered the issue of exceptions and, in the end, limited the statute to the ones set forth."  Id.; see also Thurston v. Bishop, 7 Haw. 421, 442 (Haw. Kingdom 1888) ("The rule of construction, expressio unius est exclusio alterius, then, ought to exclude all other exceptions.").  In Hawaiʻi, the principle of expressio unius est exclusio alterius is applicable "where in the natural association of ideas the contrast between a specific subject matter which is expressed and one which is not mentioned leads to an inference that the latter was not intended to be included within the statute."  Int'l Sav. & Loan Ass'n, Ltd. v. Wiig, 82 Hawaiʻi 197, 201, 921 P.2d 117, 121 (1996).

Thus, in applying the rule of construction, expressio unius est exclusio alterius, this court looks to the contrast provided by the natural association of ideas expressed in the statutory list.  Id.  Here, there is a decided contrast between the eleven specific exceptions presented by HRS § 378-3 and potential exceptions that are not mentioned.  For example, there is a clear delimitation intended by the legislature's reference in HRS § 378-3(5) to "religious or denominational institution[s] or organization[s]," such that a contrast is clearly implied that the legislature did not intend that private businesses

could also give employment preference to individuals who share a common religion or denomination.  Similarly, the legislature's use of "unreasonable structural changes or expensive equipment alterations" in HRS § 378-3(7) describes a standard that contemplates a clear contrast to reasonable structural changes or non-expensive alterations of equipment; thus, it may be inferred that the legislature plainly intended that an alteration involving a minimal or nominal cost may not be asserted as a basis to not hire a person with a disability.

Accordingly, the contrast between the exceptions listed in HRS § 378-3 and those not listed admits the firm conviction that the legislature "considered the issue of exceptions and, in the end, limited the statute to the ones set forth."  Johnson, 529 U.S. at 58.  By the same analysis, the legislature's permission to allow an employer to refuse to hire, refer or discharge an individual "for reasons related to the ability of the individual to perform the work in question," HRS § 378-3(3) (emphasis added), implies a clear contrast to reasons that have no relation to the ability to perform the job.  Thus, in accordance with the principle of expressio unius est exclusio alterius, the exceptions of HRS § 378-3 do not permit an adverse employment decision to be based on reasons unrelated to the ability of the individual to perform the work in question.

The minority offers the criticism that our decision treats HRS § 378-3 "as an exclusive list," and "the legislature was merely attempting to ensure that a particular group of key rights remained protected without listing every possible basis for an adverse employment decision."  Minority at 23, 27.  Under the minority's reasoning, "[n]othing in either [HRS §§ 378-2 or 378-3] tells the employer that it must limit its hiring decisions to reasons related to the 'ability of the individual to perform the work in question.'"  Minority at 23; see also minority at 25.  This analysis is flawed for several reasons.

First, the treatment of the eleven exceptions provided in HRS § 378-3 as an exclusive list is in full accordance with the principle of expressio unius est exclusio alterius, based upon the self-evident contrast between the eleven exceptions prescribed by HRS § 378-3 and unspecified possible exceptions.  Johnson, 529 U.S. at 58.  Second, if nothing tells the employer that it must limit its hiring decisions to reasons related to the ability of the individual to perform the work in question, then "all" nondiscriminatory reasons are permitted.  If all nondiscriminatory reasons are permitted, then there would be no purpose for an exception involving a subset of nondiscriminatory reasons "relating to the ability of the individual to perform the work in question."  See HRS 378-3(3).  Thus, the contention of the minority renders the exception provided in HRS § 378-3(3)

as superfluous, contrary to our duty to give effect to all parts of a statute when a construction can be legitimately found that will give force to and preserve all words of the statute. See Fagaragan, 132 Hawaiʻi at 241, 320 P.3d at 906. Third, it is plain that by construing the exceptions in HRS § 378-3 to have unlimited expansion for "possible bas[es]" not listed by the legislature, the minority's analysis renders not just HRS § 378-3(3), but all non-discriminatory exceptions in HRS § 378-3 as superfluous. The practical effect of a boundless expansion of the bases for exceptions listed in HRS § 378-3 is to eliminate the protections afforded by HRS § 378-2.

In order to give proper effect to the intention of the legislature, HRS § 378-2 must be construed in the context of the entire statute and consistent with its purpose to afford all persons equal opportunities in employment. See 1963 Senate Journal at 866. When read to limit lawful adverse employment decisions to those based on reasons related to the ability of the individual to perform the work in question, both HRS §§ 378-2 and 378-3(3) are enforced and preserved, in accordance with the mandate that laws on the same subject "shall be construed with reference to each other." See HRS § 1-16. Further, when read in the context of the exceptions provided by HRS § 378-3, the prohibitory language of HRS § 378-2 is consistent with the purpose identified in its legislative history "that the

qualifications of the applicants be[] the sole test in selecting employees."  1963 Senate Journal at 866; see Kauai Springs, Inc., 133 Hawai'i at 163, 324 P.3d at 973.

### d. Requirement of a legitimate, nondiscriminatory reason in our prior decisions

        The requirement that legitimate, nondiscriminatory reasons for an adverse employment action must pertain to the individual's inability to perform the work in question is supported by our prior analysis of HRS § 378-2.  In Shoppe, the employee, Shoppe, alleged age discrimination when she was terminated by her employer, Gucci.  Shoppe, 94 Hawai'i at 381, 14 P.3d at 1062.  The reason articulated by Gucci for firing Shoppe was that she was not performing her job in a satisfactory manner.  Shoppe, 94 Hawai'i at 374-76, 381, 14 P.3d at 1055-57, 1062.  Shoppe's supervisor, Perreira, testified that she had visited Shoppe's Maui store and found important inventory documents lying on the floor, which needed to be filled out and faxed to the Gucci warehouse on O'ahu in order for inventory to be shipped to Maui that day.  Shoppe missed the deadline for faxing the papers and had done so numerous times, resulting in Perreira personally reprimanding Shoppe on several occasions for her tardiness.  Id.

        The reasons Gucci articulated for firing Shoppe were therefore related to timely report filing, an important function

of Shoppe's position at Gucci.  Under these circumstances, the

Shoppe court found that Gucci had articulated legitimate

nondiscriminatory reasons:

> [T]here does not appear to be a genuine issue of fact
> regarding Plaintiff's failure to perform the duties of [a]
> store manager satisfactorily.  Therefore Defendants have
> articulated legitimate, nondiscriminatory reasons for the
> adverse employment action against Plaintiff.

Shoppe, 94 Hawai'i at 381, 14 P.3d at 1062 (emphases added).  In

other words, because the reasons Gucci articulated for the

adverse employment action were related to Shoppe's inability to

adequately perform the job in question, Gucci articulated a

legitimate, nondiscriminatory reason for firing Shoppe.

Similarly, in Simmons v. Aqua Hotels & Resorts, Inc.,

130 Hawai'i 325, 310 P.3d 1026 (App. 2013), an employee alleged,

inter alia, age discrimination under HRS § 378-2(1)(A).  Id. at

328, 310 P.3d at 1029.  The reasons given by the employer for

the adverse employment action was that the employee's position

had been restructured as part of cost-cutting measures following

bankruptcy.[19]  Id.  The employee was informed she could apply for

the restructured position.  Id. at 327-28, 309 P.3d at 1028-29.

The employee declined to apply and the employer hired a

different person for the new position.  Id.  The ICA found that

the employee established a prima facie case of discrimination.

---

[19]    The new position was substantively different, including a new
title, redefined job description, different benefits, reduced salary, and
required relocation to Kaua'i.  Simmons, 130 Hawai'i at 327, 310 P.2d at 1028.

- 44 -

Id. at 330-31, 309 P.3d at 1031-32. The ICA next found that the employer met its burden to produce legitimate, nondiscriminatory reasons for the adverse employment action because the employer's restructuring plan eliminated the employee's original position, the job description for the new position had been redefined, and the job holder was required to be readily available on-site. Id. at 331, 309 P.3d at 1029, 1032. The reasons provided were related to a person's ability to perform the work in question because they defined the requirements of the job. Therefore, the explanation given for the adverse employment action was legitimate because it was related to the ability of the employee to perform the work in question.[20]

In Dir., Dep't of Labor & Indus. Relations v. Si-Nor, Inc., No. 27497, 2009 WL 405926 (App. Feb. 18, 2009) (mem.), an employee alleged discrimination and a prima facie case of discrimination was established.[21] Id. at *8. The Hawai'i Labor Relations Board (HLRB) found testimony regarding the employee's insubordination and involvement in altercations with others more

---

[20] The ICA went on to vacate summary judgment in favor of the employer because it found genuine issues of material fact as to the employer's credibility; that is, the plaintiff had raised a material issue as to pretext. "Based on this record, a rational fact-finder could infer that Defendants' stated reasons for Plaintiff's termination lacked credibility and were pretextual." Id. at 331, 310 P.3d at 1032.

[21] In Si-Nor, it was alleged that the employer discriminated against the employee for having reported work place safety issues, in violation of HRS § 396-8(e)(3). Si-Nor, 2009 WL 405926, at *7-8. The ICA and the Hawai'i Labor Relations Board applied the three-part Shoppe-McDonnell analysis. Id. at *8-9.

credible than the employee's testimony.  Id. at *9. The ICA determined that "based on the testimony that the HLRB found credible, [the employer] had legitimate reasons for firing [the employee]."  Id.  The reasons given by the employer in Si-Nor — the ability of the employee to work without insubordination and disruptive altercations — were related to the employee's ability to perform the work in question and were therefore legitimate.

In contrast, this court evaluated the reason articulated by the employer in Sam Teague, Ltd. v. Hawai'i Civil Rights Commission, 89 Hawai'i 269, 971 P.2d 1104 (1999), and determined that the articulated reason was not legitimate.[22]  Id. at 277-79, 971 P.2d at 1112-14.  In Sam Teague, a female employee was terminated after taking a leave of absence for pregnancy, in violation of the employer's policy of not allowing leave in the first year of employment.  Id. at 272-74, 971 P.2d at 1107-09.  This court held that the employer's "no leave" policy violated Hawai'i law and administrative rules that required employers to provide a leave of absence for a "reasonable period of time" for "pregnancy, childbirth, or

_____

[22]     In Sam Teague, the employer appealed the decision and award in favor of the employee by the Hawai'i Civil Rights Commission.  The court analyzed the claims under the Shoppe-McDonnell rubric and the definitions and requirements of HRS §§ 378-1, -2, and -3.  Sam Teague, 89 Hawai'i 269, 278-81, 971 P.2d 1104, 1113-16.

related medical conditions." Id. at 277-79, 971 P.2d at 1112-14.

In addition to specifically holding that the policy was invalid, the court also evaluated the legitimacy of the employer's articulated reason for the termination: that the employee was terminated because she intentionally failed to disclose her pregnancy before accepting a job where leave was not permitted in the first year. Id. at 278-79, 971 P.2d at 1113-14. The court in Sam Teague found that the "no leave" policy had not been communicated to the employee, nor was she informed that the employer's requested "one-year commitment" meant "working twelve consecutive months with no extended leave." Id. at 273, 278-79, 971 P.2d at 1108, 1113-14. The court found that the employee "could have reasonably believed that a one-year commitment simply meant that she would remain employed with the business for at least a term of one year" and that the employee intended to return to work after the birth of her child. Id. at 279, 971 P.2d at 1114.

Based on those findings, the court concluded that the employer "failed to establish a legitimate nondiscriminatory explanation of the adverse employment action." Id. This conclusion is consistent with the principle that the reason articulated by an employer is not legitimate when it is not related to the ability of the individual to perform the work in

question.  That is, because the employee in Sam Teague was able to perform the job in conformance with the criteria as conveyed by the employer, the reason given by the employer – that the employee could not work 12 months consecutively – was unrelated to the ability of the employee to meet the requirements of the position as conveyed to the employee.

Thus, the review of the cases of our courts addressing the second step of the Shoppe-McDonnell framework reflect that that the nondiscriminatory reason articulated by the employer for the adverse employment action must be related to the ability of the individual to perform the work in question.

### 2.    Reasons provided by CDM were not legitimate

Paragraph (5)(a) of the Declaration states it was Willis' belief that Adams was not qualified for the job because "[Adams] had no sales experience in the prior five years."[23] Under the Shoppe-McDonnell analysis, we are required to determine whether the fact that "[Adams] had no sales experience in the prior five years" was a legitimate, nondiscriminatory reason for CDM not to have hired Adams.  Specifically, the analysis must consider whether sales experience in the prior

---

[23]    Willis stated his "belief" that Adams had no sales experience in the prior five years.  Adams' lack of sales experience in the past five years was established by Adams' declaration attached to Adams' Memorandum in Opposition to [CDM's] Motion for Summary Judgment Filed February 21, 2012 and her resume, which was attached as exhibit 10.

five years was related to Adams' ability to perform as a telephone sales person at CDM.

### a. CDM disavowed consideration of "sales experience"

In determining whether "sales experience in the prior five years" was related to the ability to perform the duties of the position, we note that the ultimate decision-maker in this case, Willis, specifically stated in his Declaration that he "did not consider any criteria stated in any advertising or posting in making [his] decision not to hire [Adams]." (Emphasis added). However, "sales experience preferred" was one of the listed "requirements" in the online employment solicitation published by CDM. Since "sales experience" was a "criteria stated in [] advertising," which Willis expressly disavowed as a consideration in his decision not to hire Adams, Willis' proffered reason not to hire Adams because she had no sales experience in the prior five years is plainly contradicted by his own statement that he did not consider sales experience.

As "sales experience in the past five years" was refuted as a consideration in the hiring decision by CDM's own admission, the criterion was not related to the job in question and thus was not a legitimate reason for the adverse employment action. Therefore, the Declaration's articulated criterion of "sales experience in the prior five years" did not satisfy CDM's

burden to produce a legitimate, nondiscriminatory reason for its hiring decision in this case.

### b. "Sales experience" was not shown to be related to the ability to perform the job in question

Second, even assuming the proffered justification that "sales experience in the prior five years" had not been disavowed by CDM, this justification was not related to an individual's ability to perform as a telephone sales person because it is controverted by the advertised qualifications for the job. CDM's posted solicitation for the position stated "Sales experience preferred," but the solicitation did not indicate that sales experience in the last five years was required in order to be qualified for the position.

The justification in the Declaration is also contradicted by the employee-training program highlighted in CDM's posted solicitation. CDM's solicitation stated, "We offer recognized training to build upon your formal education/experience and teach you the business of advertising and summit sales . . . ." "Here are a few key benefits of working at CDM Media: . . . First-class Sales Training Program from the best in the industry." Similarly, a newspaper article regarding CDM's employment solicitation stated "[a]ll sales hires will go through an eight-week comprehensive training course."

"Sales experience in the prior five years" was not shown to be related to Adams' ability to perform the duties of a telephone sales person because CDM's hiring advertisements indicated that sales experience was not required to be qualified for the position and also promised to provide extensive sales training. Thus, the criterion of "sales experience in the prior five years" was not a required qualification for the position, not a legitimate reason for the adverse employment action, and not related to Adams' ability to perform the job in question. Therefore, CDM failed to meet its burden of production in the second step of the Shoppe-McDonnell analysis.

**c. "Legitimate" is integral to the Shoppe-McDonnell analysis**

The employer's burden to articulate a legitimate, nondiscriminatory reason is not a burden to prove the truth of the legitimate, nondiscriminatory reason. That is, the requirement in the second step is that the "explanation" articulated be legitimate, Shoppe, 94 Hawai'i at 378, 14 P.3d at 1059, not that the employer prove that the reason was true or correct.

Further, the evaluation of the legitimacy of the articulated reason is distinct from an evaluation of the credibility of a defendant. The evaluation of the legitimacy of a nondiscriminatory reason for an adverse employment action in the context of the Shoppe-McDonnell test is only whether the

reason is related to the ability of the individual to perform the work in question; in contrast, an evaluation of credibility looks to whether the reason was believed or is worthy of credence.  Thus, the evaluation of legitimacy does not transform the burden to produce a legitimate reason into a burden to prove that reason.[24]

However, the minority would go further, essentially reading "legitimate" out of the Shoppe-McDonnell test.  See minority at 16-18.  The minority would hold that "an employer's proffered reason must be taken as true."  Id. at 18, 19 (emphasis added); see also id. at 31 ("[W]e must assume that the proffered evidence is true.").  Under the minority's analysis, no analysis of the legitimacy of the reason is permissible; a court is required to accept any nondiscriminatory reason and one completely unrelated to the qualifications of the individual to perform the job.  Respectfully, the authority cited for this proposition, Mary's Honor Center v. Hicks, 509 U.S. 502 (1993), and Shoppe, 94 Hawai'i at 378, does not mandate unexamined acceptance of any nondiscriminatory reason.

Hicks states that in the second step of the McDonnell Douglas analysis, the employer must "introduce evidence which,

---

[24]    Thus, the contention of the minority that under this decision the "burden shifts to the employer-defendant to prove that the reasons for its decision," minority at 33, is incorrect.

taken as true, would <u>permit</u> the conclusion that there was a nondiscriminatory reason for the adverse action." <u>Hicks</u>, 509 U.S. at 509 (emphasis in original). Some examination by the court is implied by the directive that the evidence presented must be sufficient to "<u>permit</u> the conclusion." <u>See also</u> <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 255 (1981) (holding that the "explanation provided must be legally sufficient to justify a judgment for the defendant" and noting that the "sufficiency of the defendant's evidence <u>should be evaluated</u>" (emphasis added)).[25] Similarly, <u>Shoppe</u> states, "The

---

[25] The remaining cases cited by the minority do not reduce the requirement that the legitimate, nondiscriminatory reason "must be <u>legally sufficient</u> to justify a judgment for the defendant." <u>Burdine</u>, 450 U.S. at 255 (emphasis added); <u>see</u> <u>Woodson v. Scott Paper Co.</u>, 109 F.3d 913, 920 n.2 (3d Cir. 1997) (The second step "is satisfied if the defendant articulates any legitimate reason for the discharge"); <u>Krenik v. Cnty. of Le Sueur</u>, 47 F.3d 953, 958 (8th Cir. 1995) ("In the second part . . . the burden shifts to the defendant who must . . . produc[e] evidence, 'that the plaintiff was rejected . . . for a legitimate, nondiscriminatory reason.'"). <u>Trans World Airlines, Inc. v. Thurston</u>, 469 U.S. 111 (1985), minority at 28, did not substantively discuss legitimacy because it did not apply <u>McDonnell Douglas</u>. The "test is inapplicable where the plaintiff presents direct evidence of discrimination. . . . In this case, there is direct evidence." <u>Id.</u> at 121; <u>see also</u> <u>Wright v. Southland Corp.</u>, 187 F.3d 1287, 1305 (11th Cir. 1999) (same) (cited by minority at 30).

A review of the cases cited by the minority in support of its argument that an employer's action may be based on an objectively false but honestly held belief do not refute the conclusion that the reason articulated still must be legitimate because legitimacy was not at issue in those cases. Minority at 35-37; <u>see</u> <u>Sybrandt v. Home Depot, U.S.A., Inc.</u>, 560 F.3d 553, 558 (6th Cir. 2009) (plaintiff stipulated that the employer "articulated a facially legitimate, nondiscriminatory reason for terminating her employment"); <u>Flores v. Preferred Technical Grp.</u>, 182 F.3d 512, 515 (7th Cir. 1999) (articulated reason was insubordination and "[i]nsubordination is a legitimate, nondiscriminatory reason for firing an employee"). In other cases cited by the minority, the second prong of the <u>McDonnell Douglas</u> test was not substantively examined but the articulated reasons were manifestly legitimate. <u>See</u> <u>Villiarimo v. Aloha Island Air, Inc.</u>, 281 F.3d 1054, 1062-63 (9th Cir. 2002) (articulated reason was that employee violated company procedures and was dishonest during the ensuing investigation); <u>Tesh v. U.S.</u>

(continued. . .)

employer's explanation must be in the form of admissible evidence and must clearly set forth reasons that, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the challenged employment action." Shoppe, 94 Hawai'i at 378, 14 P.3d at 1059 (emphasis added). Thus, Shoppe, too, indicates that the nondiscriminatory reason must be evaluated for legitimacy.

The Shoppe decision undertook just such an analysis:

> Under these circumstances, there does not appear to be a genuine issue of fact regarding Plaintiff's failure to perform the duties of store manager satisfactorily. Therefore, Defendants have articulated legitimate, nondiscriminatory reasons for the adverse employment action against Plaintiff.

Shoppe, 94 Hawai'i at 381, 14 P.3d at 1062 (emphasis added); see also Sam Teague, 89 Hawai'i at 279, 971 P.2d at 1114 ("Therefore, [employer] has failed to establish a legitimate nondiscriminatory explanation of the adverse employment action."). Thus, our examination of legitimacy is consistent with this court's prior holdings.

The minority's analysis is inconsistent with these prior decisions. Our case law has not provided any decision in which a reason unrelated to the ability of the person to perform

_____

(. . .continued)
Postal Serv., 349 F.3d 1270, 1272 (10th Cir. 2003) (articulated reason for termination was that "an investigation revealed that [employee] was dishonest in pursuing [a] workers' compensation claim"); Majewski v. Automatic Data Processing, Inc., 274 F.3d 1106, 1116 (6th Cir. 2001) (articulated reason was the employee's "increasingly poor job performance").

the job has been accepted as satisfying the second step of the

Shoppe-McDonnell analysis.  The minority's reasoning would

impose new constraints on our law by unreasonably restricting

the power of a court to evaluate the legitimacy of a defendant's

articulated reason.  Thus, the analysis of the minority is

contrary to Hawai'i law that the hiring or discharge decision of

an individual protected under HRS § 378-2 shall be related to

the ability of the person to perform the work in question.

The minority maintains that the McDonnell Douglas test

represents a "universally accepted framework."  Minority at 31.

However, McDonnell Douglas has been the subject of significant

academic criticism.[26]  It has been objected to by prominent state

jurists for its lack of clarity and effect of undermining its

own purpose and provoked a line of criticism over its use in the

summary judgment context.  In Trott v. H.D. Goodall Hosp., 66

A.3d 7 (Me. 2013), Justice Silver wrote separately to reaffirm

his position that the Maine Supreme Court "should not apply the

three-step, burden-shifting [McDonnell Douglas] analysis . . .

---

[26]     See, e.g., Sandra F. Sperino, Beyond McDonnell Douglas, 34
Berkeley J. Emp. & Lab. L. 257 (2013); William R. Corbett, Fixing Employment
Discrimination Law, 62 SMU L. Rev. 81 (2009); Martin J. Katz, Unifying
Disparate Treatment (Really), 59 Hastings L.J. 643 (2008); Jamie Darin
Prenkert, The Role of Second-Order Uniformity in Disparate Treatment Law:
McDonnell Douglas's Longevity and the Mixed-Motives Mess, 45 Am. Bus. L.J.
511, 512-15 (2008); Michael J. Zimmer, The New Discrimination Law: Price
Waterhouse Is Dead, Whither McDonnell Douglas?, 53 Emory L.J. 1887, 1930
(2004); Michael Evan Gold, Towards a Unified Theory of the Law of Employment
Discrimination, 22 Berkeley J. Emp. & Lab. L. 175 (2001).

to discrimination claims at the summary judgment stage" because "it unnecessarily complicates the courts' already difficult task." Id. at 16 (Silver, J., concurring). "This rigid and artificial . . . analysis confuses rather than clarifies the ultimate issue in employment discrimination cases: whether there is evidence of discrimination." Id. (internal quotation marks omitted); see Curlee v. Kootenai Cnty. Fire & Rescue, 224 P.3d 458, 463 (Idaho 2008) (concluding that while the burden-shifting analysis is applicable at trial, it should not be applied at summary judgment); Heng v. Rotech Med. Corp., 688 N.W.2d 389, 401 (N.D. 2004) (stating that McDonnell Douglas has "little or no application at the summary judgment stage").

Federal jurists, too, have raised similar concerns. Judge Magnuson of the Eighth Circuit expressed in Griffith v. City of Des Moines, 387 F.3d 733 (8th Cir. 2004), that "[a]bsent from [McDonnell Douglas] was any justification or authority for this scheme" and observed that McDonnell Douglas has "confused courts across the nation." Id. at 740 (Magnuson, J., concurring specially). "[C]ourts have failed to thoroughly examine the language of the statute and congressional intent, and instead have fought to keep an arbitrary paradigm alive." Id. at 747 (emphasis added). Judge Wood of the Seventh Circuit Court of Appeals called "attention to the snarls and knots" of the McDonnell Douglas test, referring to it as an "allemande worthy

of the 16th century."[27]  Coleman v. Donahoe, 667 F.3d 835, 863 (7th Cir. 2012) (Wood, J., concurring).  "The original McDonnell Douglas decision was designed to clarify and to simplify the plaintiff's task . . . unfortunately, both of those goals have gone by the wayside."  Id.  Judge Hartz of the Tenth Circuit Court of Appeals stated, "The use of the McDonnell Douglas framework [] readily lends itself to consideration of formalities instead of the essence of the issue at hand."  Wells v. Colo. Dep't of Transp., 325 F.3d 1205, 1225 (10th Cir. 2003) (Hartz, J., concurring).  Judge Tymkovich, also of the Tenth Circuit Court of Appeals, stated adoption of the McDonnell Douglas framework "has left the entire area of law confused" and that the McDonnell Douglas "inquiry distracts the court from what it should be focusing its attention on: determining whether the plaintiff produced sufficient evidence of discrimination."[28]

---

[27]     An "allemande" is a dance form associated with Baroque music originating in Europe in the sixteenth century, often involving lines of couples dancing with interlocked arms.  Allemande, Wikipedia (Feb. 15, 2015, 2:28 PM), http://en.wikipedia.org/wiki/Allemande.

[28]     The Supreme Court has moved away from a burden-shifting framework in certain types of discrimination cases.  In Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), the Court stated that Burdine is inapplicable to prove sex discrimination when the employer's motive was a mixture of legitimate and illegitimate reasons.  Id. at 246-47 (plurality opinion); see also Desert Palace, Inc. v. Costa, 539 U.S. 90, 99 (2003) (holding that a plaintiff in a mixed motive case is required to prove his or her case by a preponderance of the evidence, using direct or circumstantial evidence).  Similarly, in Gross v. FBL Financial Services, Inc., 557 U.S. 167 (2009), when the Court declined to apply McDonnell Douglas in a mixed-motive, age discrimination complaint brought under federal law, instead holding that a "plaintiff must prove by a preponderance of the evidence . . . that age was the 'but-for' cause of the challenged employer decision."  Id. at 177-78.

The Honorable Timothy M. Tymkovich, The Problem with Pretext, 85 Denv. U. L. Rev. 503, 505, 522 (2008).

The McDonnell Douglas framework, (or, in Hawai'i, the Shoppe-McDonnell test), is an analysis adopted by courts to apply an anti-discrimination law. The Shoppe-McDonnell test does not establish or modify HRS § 378-2, but instead it is a court-designed tool to effectuate the statute. Thus, what constitutes as a legitimate, nondiscriminatory reason under HRS § 378-2 ultimately must be discerned by an examination of the statute, its legislative history, and other principles of statutory construction. See Griffith, 387 F.3d at 747 (Magnuson, J., concurring specially). The relevance of the manner in which other courts may have interpreted the McDonnell Douglas framework is limited to the extent that the analyses of these courts were not designed to give effect to HRS § 378-2 and did not take into account the purpose and protections afforded by the Hawai'i legislature, which has specifically informed our analysis.

The minority's effective elimination of "legitimate" from the Shoppe-McDonnell analysis would place Hawai'i employees eligible for protection because of race, sex, sexual orientation, age, religion, color, ancestry, disability, marital status, or status as a victim of domestic or sexual violence at a significant disadvantage. Under the minority's analysis, the

employer could posit any nondiscriminatory reason in order to rebut the plaintiff's prima facie case, contrary to Hawai'i law, the intent of the legislature, and the prior holdings of this court, all in defense of a test that, as one jurist phrased it, "readily lends itself to consideration of formalities instead of the essence of the issue at hand."[29]

### d. Hypotheticals posed by the minority are insubstantial

The minority posits a series of strained hypotheticals that it argues would result from a court's examination of "legitimate;" however, each lacks substance and is readily answerable.

The minority first suggests that "whenever the number of equally qualified applicants exceeds the number of positions, those qualified applicants not hired could have a cause of action" because "the only legitimate hiring consideration is whether the person is qualified." Minority at 37. However, it is clear that the purpose of HRS Chapter 378 is not to prohibit

---

[29] The requirement that the job selection criteria be related to the job in question already operates in Title VII of the Civil Rights Act of 1965 prohibiting discrimination in hiring practices based on race, color, religion, sex, and national origin. That law "proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation." Griggs v. Duke Power Co., 401 U.S. 424, 431 (1971). "The touchstone is business necessity." Id. (emphasis added). Thus, "[i]f an employment practice which operates to exclude [a racial category] cannot be shown to be related to job performance, the practice is prohibited." Id. (emphasis added). There is no indication that Title VII of the Civil Rights Act of 1965 has resulted in a flood of spurious claims against employers based upon the hypothetical scenarios envisioned by the minority, and thus we are assured that the application of the law enacted by our legislature will not create such consequences.

selection among applicants; it is to set forth the acceptable criteria for selection upon qualifications related to the position offered. HRS § 378-3(3) ("Nothing in this part shall be deemed to . . . [p]rohibit or prevent an employer from refusing to hire . . . any individual for reasons relating to the ability of the individual to perform the work in question . . . ."). Thus, an employer may select an employee from a pool of applicants to fill a limited number of positions by comparing and contrasting job-related qualifications without creating a cause of action.

The minority also suggests that under our definition of legitimate, the employer could not take an applicant's "personality" into consideration in its decisions. Minority at 38. To the contrary, an individual's personality may be a legitimate reason for an adverse employment decision when the personality trait is related to the ability to perform the work in question. On the other hand, an employee's burden to show discrimination would be insurmountable if an employer could make adverse hiring decisions based on personality traits that were unrelated to the ability to perform the job.[30]

---

[30] A discriminatory basis for an adverse hiring decision could be readily justified by characterizing the reason as based on "personality." Personality embraces a person's moods, attitudes, opinions, motivations, and style of thinking, perceiving, speaking, and acting." Personality, Merriam-Webster, http://www.merriam-webster.com/dictionary/personality (last visited December 29, 2014). Thus, if personality was a legitimate reason for an
(continued. . .)

Similarly, the minority suggests that an employer could face liability for incorrectly assigning a high score on an employment exam to the wrong person. Minority at 38-39. However, it would seem probable that such an exam would test qualities related to the ability to perform the work in question; thus the exam results would be related to the job, even if mistakenly applied to the wrong individual.[31]

### 3. Undisclosed criteria may weigh against finding of legitimate

Although not necessary to its primary holding based on illegal pregnancy discrimination, this court's decision in Sam Teague focused in part on the employer's failure to inform the employee of the "no leave" policy or the meaning of the one-year commitment. 89 Hawai'i at 273, 279, 971 P.2d at 1108, 1114. The ruling in Sam Teague that failing to communicate the existence of a job criterion is a factor that weighs against an employer's use of that criterion as a legitimate nondiscriminatory reason for an adverse employment action is consistent with HRS Chapter

---

(. . .continued)
adverse action even when unrelated to the position, an employer could decline to hire a person on the grounds of mannerisms or style that may be culturally based.

[31]     The minority appears to also assert that test results are hearsay and are thus precluded from providing a legitimate, nondiscriminatory reason. Minority at 35. To clarify, an in-court statement based on personal knowledge of test results is not hearsay. In contrast, if a statement in a declaration relies upon information provided by another person, as in this case, it is not based on personal knowledge and is inadmissible as hearsay, barring an exception to the hearsay rule. See infra, section III.C.5.

378's purpose of ensuring that employment decisions are made based on "factors [that] are applied equally to all applicants." 1963 Senate Journal at 866.

If an employer discloses the criteria that the employer actually uses to evaluate candidates, it is more likely that the employer is applying these criteria to all applicants. Conversely, "informal, secretive and subjective hiring or promotion decision processes tend to facilitate the consideration of impermissible criteria." Roberts v. Gadsden Mem'l Hosp., 835 F.2d 793, 798 (11th Cir. 1988).

Unpublicized or undisclosed criteria are not likely to be established occupational qualifications, nor can it be assumed that they are applied equally to all persons. See Rowe v. Gen. Motors Corp., 457 F.2d 348, 359 (5th Cir. 1972) (recognizing mechanisms for employment discrimination that involved promotion/transfer criteria "which can be covertly concealed"); Porter v. Milliken & Michaels, Inc., No. CIV. A. 99-0199, 2001 WL 1315435 (E.D. La. June 28, 2001) (noting that "[c]ourts have found that informal, secretive and subjective hiring or promotion decision processes tend to facilitate the consideration of impermissible criteria"). Therefore, undisclosed criteria measuring a person's ability to perform the work in question are less likely to form the basis of legitimate and nondiscriminatory reasons for adverse employment actions.

Here, "sales experience in the prior five years" was not publicized or disclosed as a hiring criterion in any materials in the record other than in Willis' Declaration. CDM presented no evidence that the requirement of "sales experience in the prior five years" was applied or disclosed to any other applicant.[32] Thus, the criterion of "sales experience in the prior five years" may have been an informal and undisclosed hiring criterion applied only to Adams.[33] Second, Willis' Declaration expressly states that he did not use "any criteria stated in any advertising or posting in making my decision not to hire [Adams]." However, the Declaration does not indicate whether this was also true for other applicants. Therefore, it is not clear if the hiring criteria used to evaluate applicants were publicized or disclosed to any person applying for the position. CDM's rejection of its own publicized hiring criteria may also indicate that an informal, undisclosed, and individualized hiring criterion was applied to Adams. Consequently, the undisclosed hiring criterion relied upon by CDM to conclude that Adams was unqualified for the position,

---

[32] CDM also did not present evidence that sales experience in the past five years was a usual or customary hiring requirement for the particular position at issue, for any other position at CDM, or for the industry in general.

[33] CDM's disqualifying criteria - lack of sales experience in the past five years - correlates exactly with Adams' actual recent lack of sales experience and may also indicate that an individualized criterion was applied to Adams.

which may or may not have been applied to any other applicant, also weighs against a finding that the proffered reason was a legitimate, nondiscriminatory reason for the adverse employment action against Adams.

**4.    Additional reasons provided by CDM are inadmissible hearsay**

Willis also set forth three additional reasons for not hiring Adams, which can be considered collectively.  The Willis Declaration states:

> 5.    It was my belief that the Plaintiff was not qualified for the job because:
>
>        . . .
>
>    b.    <u>As far as I understood</u>, most of her recent (previous 10-15 years) sales experience was in publishing and/or selling phone book advertising which incorporated outside sales and face to face communication;
>
>    c.    <u>As far as I understood</u>, she had little or no sales experience that involved selling to C-Level corporate executives of Fortune 1,000 companies; and
>
>    d.    <u>I was advised</u> that she had said that she disliked tedious work.

(Emphases added).

Affidavits submitted by parties in support of a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts <u>as would be admissible in evidence</u>, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  HRCP Rule 56(e) (2000) (emphasis added).  "It is axiomatic that a motion for summary judgment should be decided on the basis of admissible evidence."

<u>Munoz v. Yuen</u>, 66 Haw. 603, 605, 670 P.2d 825, 826 (1983) (per curium).

Thus, "[t]he rule in Hawai'i is that an affidavit consisting of inadmissible hearsay cannot serve as a basis for awarding or denying summary judgment." <u>Hawaii Cmty. Fed. Credit Union v. Keka</u>, 94 Hawai'i 213, 221, 11 P.3d 1, 9 (2000) (alterations omitted) (internal quotation marks omitted) (quoting <u>GE Capital Hawaii, Inc. v. Miguel</u>, 92 Hawai'i 236, 242, 990 P.2d 134, 140 (App. 1999)); <u>see also</u> HRE Rule 801 (2002); HRE Rule 802 (1980); <u>Fuller v. Pac. Med. Collections, Inc.</u>, 78 Hawai'i 213, 224, 891 P.2d 300, 311 (App. 1995) ("[HRCP Rule 56(e)] requires that facts set forth in the affidavits be admissible in evidence. . . . These requirements are mandatory."). "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." HRE Rule 602 (1992); <u>see also</u> <u>Miller v. Manuel</u>, 9 Haw. App. 56, 66, 828 P.2d 286, 292 (1991) ("Affidavits in support of a summary judgment motion are scrutinized to determine whether the facts they aver are admissible at trial and are made on the personal knowledge of the affiant."). Personal knowledge means "the witness perceived the event about which [the witness] testifies and [] has a present recollection of that perception." HRE Rule 602 Commentary.

Therefore, an affidavit from an employer supporting a motion for summary judgment must be based on personal knowledge of the matter, i.e., admissible evidence.  "The employer's explanation must be in the form of admissible evidence and must clearly set forth reasons that, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the challenged employment action."  Shoppe, 94 Hawai'i at 378, 14 P.3d at 1059 (emphasis added).

Correlatively, inadmissible evidence or hearsay cannot support an affidavit in a motion for summary judgment that purports to show a legitimate, nondiscriminatory reason for an adverse employment action in a discrimination-based claim applying the three-part Shoppe-McDonnell analysis.[34]  Takaki v. Allied Mach. Corp., 87 Hawai'i 57, 69, 951 P.2d 507, 519 (App. 1998) (stating, in the context of discrimination claims based on race and work injury, "a motion for summary judgment may be decided only on the basis of admissible evidence"); see also Lales v. Wholesale Motors Co., 133 Hawai'i 332, 361-62, 328 P.3d

_____

[34]    Allowing the decision-maker to rely on asserted third-party knowledge would shield the employer from discriminatory acts of anyone surrounding the ultimate decision-maker, even if those actions were designed and intended to result in an adverse employment action.  See Staub v. Proctor Hosp., 131 S. Ct. 1186, 1189, 1193 (2011) (finding that, under a "cat's paw" theory, an employer was not shielded from the discriminatory actions of an employee's supervisors — even if they were not the ultimate personnel decision-makers — if the ultimate decision-maker made a decision based on negative reports by the discriminatory supervisors that were put in the employee's personnel file specifically with the intent of getting the employee fired).

341, 370-71 (2014) (discussing how, in the context of the third step of the Shoppe-McDonnell analysis of discrimination claims based on retaliatory discharge under HRS § 378-2(2), evidence must be admissible in order to be relied upon in a HRCP Rule 56(e) motion for summary judgment).

If a legitimate, nondiscriminatory reason could be shown by evidence not based on personal knowledge and the plaintiff was unable to demonstrate pretext in the third step of the Shoppe-McDonnell test, the consequence would be that a motion for summary judgment would be granted based on inadmissible evidence, contrary to the fundamental law of this jurisdiction. See HRCP Rule 56(e) ("Supporting and opposing affidavits [in a motion for summary judgment] . . . shall set forth such facts as would be admissible in evidence . . . ."); Fuller, 78 Hawai'i at 224, 891 P.2d at 311 ("[T]he circuit courts should ascertain whether a foundation has been established for the admissibility of evidence offered in support of the motion before an order granting summary judgment is filed."); Munoz, 66 Haw. at 605, 670 P.2d at 826; Keka, 94 Hawai'i at 221, 11 P.3d at 9; Miller, 9 Haw. App. at 66, 828 P.2d at 292. Thus, the principle that evidence supporting a motion for summary judgment must be admissible applies in a motion for summary judgment upon a discrimination-based claim as it does in any other motion for summary judgment.

In the Willis declaration, subparagraphs (b) and (c) begin with the following: "[a]s far as I understood," which indicates that the basis for the information is from an unidentified third person or external source.  Likewise, subparagraph (d) states: "I was advised," again indicating that the source of the information is an unidentified third party.  The reasons stated in subparagraphs (b), (c), and (d) of Willis' Declaration do not demonstrate that they are based on Willis' personal knowledge because the bases for the information are unidentified third persons or external sources.  Therefore, the proffered reasons in subparagraphs (b), (c), and (d) are not admissible statements and, accordingly, do not articulate legitimate, nondiscriminatory reasons for the adverse employment action against Adams.

Further, the facts of the case belie that Willis' statements were based on "personal knowledge," as asserted by the minority.  Minority at 34-35.  A mere recitation that the witness "understood" or was "advised" of a fact is insufficient, in itself, to establish that the witness perceived the facts for which testimony is offered, i.e. that the testimony is based on personal knowledge.  See Addison M. Bowman, Hawai'i Rules of Evidence Manual § 602-1[3] (2014-15 ed.) (finding testimony of a person on O'ahu regarding weather on the Big Island is objectionable on lack of personal knowledge grounds); State v.

Apollonio, 130 Hawai'i 353, 362, 311 P.3d 676, 685 (2013) (striking testimony of a witness where nothing in evidence would support a finding that the witness had personal knowledge of the fact at issue).

Here, it is uncontroverted that Willis never met Adams; Adams' only interview was with Bera, CDM's Human Resources Director.[35] According to CDM's established hiring procedure, Bera "host[ed] the first round of interviews and review[ed] all candidates that came in for [an] interview and narrow[ed] down the list of potential candidates to meet with [Willis]." (Emphasis added). Thus, based on established hiring procedures and the fact that Adams only met with Bera, Willis' two statements indicating "as far as I understood" and the statement "I was advised" are clearly not based on Willis' personal knowledge. Further, it would appear that Bera had significant input in the decision not to hire Adams, if he did not make the decision outright.

Additionally, Willis' Declaration states in paragraph six that CDM did not hire any younger applicants with equal or lower qualifications for the position. Although not specifically stated as a reason for Adams not being qualified for the position, paragraph six is entirely conclusory, and no

---

[35] The record does not contain a declaration from Bera.

admissible evidence was adduced to establish this "fact."[36]

"Ultimate or conclusory facts or conclusions of law are not to be utilized in a summary judgment affidavit."  Miller, 9 Haw. App. at 66, 828 P.2d at 292.  Accordingly, Willis' statement that no younger, equally or less qualified applicants were hired cannot form the basis of a legitimate reason not to hire Adams.

The minority acknowledges that "[a]n employer satisfies this second step through admissible evidence of the employer's reason for its decision."  Minority at 18 (emphasis added).  The minority does not assert that Willis had any interaction with Adams or contest that Willis must have obtained the information contained in subparagraphs (b), (c), and (d) of his Declaration from some other source.  According to the minority, these subparagraphs "were offered for the limited non-hearsay purpose of articulating a reason why he made the decision not to hire Adams."  Id. at 34-35.  Thus, as the minority contends that subparagraphs (b), (c), and (d) of the Willis Declaration are admissible non-hearsay, the minority is asserting that the statements in Willis' Declaration were not offered for the truth of the reasons contained within those

---

[36]    That is, there was no admissible evidence as to any actual sales experience of the hired applicants, or whether any such experience occurred within the past five years.

statements but only to demonstrate that Willis had reasons for his decision.

However, the minority also insists the reasons proffered by the employer "must be taken as true," minority at 18-19, without evaluation of the substance of those reasons. See, e.g., id. at 32 ("[W]e must assume that the proffered evidence is true."). If the reasons proffered by a defendant-employer must be taken as true, then the argument of the minority that the employer's reasons are not offered for their truth, is logically precluded.

Additionally, if the proffered reasons are not offered for their truth and only offered to demonstrate that the employer had a legitimate reason, then a plaintiff could never prove pretext in the third step of the Shoppe-McDonnell test. That is, if the proffered reason is not offered for its truth, then it could not be shown as a pretext for discrimination because it was not offered as a true reason for the defendant-employer's action.

It is manifest that the reasons of the employer are proffered for their truth, as it is unassailable that a court would not accept as a legitimate, nondiscriminatory reason the bare statement by an employer that an individual was not hired because of an unspecified reason. Rather, an employer's statement could only provide a legitimate, nondiscriminatory

reason to the court if the employer identifies and provides the basis for that reason. Here, the substantive reasons proffered were that Adams' previous sales experience was in outside sales, Adams had little to no experience selling to C-level corporate executives, and Adams had said she disliked tedious work. These statements were offered upon a central disputed issue in the summary judgment proceeding for application in the second prong of the Shoppe-McDonnell test and were intended by the employer to be duly considered by the trial court as CDM's articulation of its legitimate, nondiscriminatory reasons for not hiring Adams.[37] Consequently, in compliance with our law of summary judgment, Willis was required to have personal knowledge of the matters asserted in his statements in order to satisfy the burden of production imposed on CDM.

The minority further indicates that Willis' Declaration was admissible "even if the . . . reasoning is based on third-party information." Id. at 35 (emphasis added). However, there is no alternate standard by which evidence is admitted under the Shoppe-McDonnell test. If the statement of a

_____

[37] In applying the second step of the Shoppe-McDonnell analysis, the trial court was not required to ascertain whether Adams' previous sales experience was actually in outside sales, whether Adams had little to no experience selling to C-level corporate executives, or whether Adams had said she disliked tedious work; instead, assuming those reasons were provided in admissible form, the trial court only needed to consider whether the defendant-employer satisfied its burden of production to show that the reasons provided were both non-discriminatory and related to Adams' ability to perform the work in question.

party is offered to prove the truth of the matter asserted, the report from a party not present in the court — i.e. "third-party information" — remains inadmissible.  HRE Rules 801, 802.  The undisputed facts are that Willis had no interaction with Adams.  As Willis could only have gained the information in his declaration from Bera, his declaration is based on third-party information; it is thus hearsay and is inadmissible.[38]  HRE Rule 802.

The minority does not contend that Willis' statements would be admissible at trial.  If Willis were to testify at a trial, he could only testify that he had acted based on

---

[38]    The cases cited by the minority do not reduce the requirement that the evidence submitted must be admissible.  See minority at 35 (citing Rivera v. City & Cnty. of Denver, 365 F.3d 912 (10th Cir. 2004)); McDonald-Cuba v. Santa Fe Protective Servs., Inc., 644 F.3d 1096 (10th Cir. 2011)).  In both cases, the second step of the McDonnell Douglas test was not in dispute; thus in neither case did the court examine the admissibility of the evidence supporting the legitimate, nondiscriminatory reason.  Rivera, 365 F.3d at 920 ("[W]e address only the issue of pretext."); McDonald-Cuba, 644 F.3d at 1102 (analyzing only the pretext issue).

Furthermore, in neither case was the personal knowledge of the defendant regarding the relevant information disputed.  In Rivera, a city worker was disciplined for falsifying a work report.  The minority seizes on the fact that the supervisor "was informed" of certain information; however, the information of which the supervisor "was informed" related to information supporting the falsity of the report.  Rivera, 365 F.3d at 918.  The supervisor based his actual decision on "all of the information before him," consisting of six specific reasons, including the supervisor's own calculations.  Id. at 919.

Similarly, in McDonald-Cuba, the plaintiff-employee formed a company that she registered on the Central Contracting Registry (CCR), a database for government contractors, where it was identified as performing security guard services.  McDonald-Cuba, 644 F.3d at 1099.  The employer company president "discovered the CCR printout" and determined there was a "huge conflict of interest" from plaintiff's competing business and promptly terminated the employee.  McDonald-Cuba, 644 F.3d at 1099, 1103.  Nothing in McDonald-Cuba suggests the defendant lacked personal knowledge regarding the plaintiff's competing business.

information provided to him without describing the substance of that information.  The information itself would be admissible only through another witness with personal knowledge.  Thus, the contention of the minority that hearsay is admissible for the "limited non-hearsay purpose" of articulating a legitimate, nondiscriminatory reason for an adverse employment action is contrary to HRCP Rule 56(e), which governs summary judgment proceedings and unequivocally requires "facts as would be admissible in evidence."  HRCP Rule 56(e) (2000) (emphasis added).

Affidavits or testimony pertaining to employment discrimination are not exceptions to the rule disallowing hearsay.  HRE Rule 802.  As stated, allowing summary judgment to be rendered on evidence that includes inadmissible hearsay is contrary to Hawai'i law.  See Munoz, 66 Haw. at 605, 670 P.2d at 826; Takaki, 87 Hawai'i at 69, 951 P.2d at 519; Lales, 133 Hawai'i at 361-62, 328 P.3d at 370-71.  The minority's analysis, therefore, would create an exception with regard to employment discrimination claims, allowing summary judgment to be based on an affidavit that was premised upon inadmissible hearsay statements.  This would create a lower standard for evaluating employment discrimination claims, contrary to the purpose of the law to "protect and safeguard the right and opportunity of all

persons to seek . . . employment . . . without discrimination."
1963 Senate Journal at 866.

Weakening the evidentiary standard in this context would create an additional layer of confusion to this already complicated test and weaken the ability of individuals to avail themselves of the protection of our laws; a danger that has been previously recognized.  See H.D. Goodall Hosp., 66 A.3d at 16 (Silver, J., concurring) (criticizing the use of the McDonnell Douglas test in summary judgment); City of Des Moines, 387 F.3d at 740 (Magnuson, J., concurring specially) (same); Coleman, 667 F.3d at 863 (Wood, J., concurring) (same); Colo. Dep't of Transp., 325 F.3d at 1225 (Hartz, J., concurring) (same); see also Tymkovich, The Problem with Pretext, 85 Denv. U. L. Rev. at 505, 522 (2008).

### 5.   CDM did not articulate a legitimate, nondiscriminatory reason

In summary, the justification of "no sales experience in the prior five years" was not related to Adams' ability to perform as a telephone sales person at CDM because it was negated as a hiring criterion by Willis, and it was controverted as a required qualification for the position by statements in the solicitation.  "Sales experience in the prior five years" also may have been an undisclosed hiring criterion that may have been applied only to Adams.  The remaining reasons proffered by

Willis' Declaration in subparagraphs (b), (c), and (d) were inadmissible statements that may not be considered by a court. Therefore, we conclude that CDM did not satisfy its burden to produce a legitimate, nondiscriminatory reason for declining to hire Adams as an International Media Sales Executive.[39]

## IV. Conclusion

Based on the foregoing reasons, the ICA erred in affirming the circuit court's granting of summary judgment. The ICA's November 21, 2013 Judgment on Appeal and the circuit court's July 24, 2012 Final Judgment are vacated, and this case is remanded to the circuit court for further proceedings consistent with this opinion.

Charles H. Brower                    /s/ Sabrina S. McKenna
for petitioner
                                     /s/ Richard W. Pollack
Diane W. Wong
for respondent                       /s/ Steven S. Alm



---

[39]     Adams presented a prima facie case of age discrimination and CDM failed to satisfy its burden to produce a legitimate, nondiscriminatory reason for not hiring Adams.  As no legitimate reason was adduced, we need not address pretext in the third step of the Shoppe-McDonnell analysis.